### The Frank G. Fowler.

*(District Court, S. D. New York.   April 30, 1881.)*

1. Canal-Boat in Tow of Tug on Long Island Sound—Seeking Shelter in Storm – Want of Anchor—Negligence—Direct Damage—Cutting Boat Adrift – Scarcity of Fuel—Admission in Pleading.

     Where a tug, having in tow a canal-boat loaded with coal, started from New London for New York in November, the weather being fair and the sea smooth, and when off the westerly end of South Sand shoal was compelled to seek shelter on account of an increasing easterly storm, the boat becoming unmanageable and having broken her tiller, and put in under the lee of Duck island about 2 o'clock P. M., where she circled round and round to avoid drifting ashore, the boat having no anchor, and that of the tug being too small to hold both vessels, and although she was in a safe place, and the storm had not abated, resumed her course about midnight for New Haven, but was soon compelled to cut the boat adrift, after taking her master and his baggage aboard, and the boat was found by her master the next day in Guilford creek, uninjured, in charge of salvors, who had found her in Guilford harbor, and brought her in and supplied her with an anchor, but she subsequently dragged her anchor in a southerly storm, and was badly strained by getting across the channel,—

     *Held,* on the evidence, that the master of the boat used reasonable diligence and good judgment in trying to secure and protect his boat from injury after she was discovered in the possession of the salvors, and that the subsequent damage was not caused by his negligence, and that such subsequent damage was the natural and probable result of her being cast adrift by the tug; that the want of an anchor, even if a defect in the equipment of a canal-boat on Long Island sound, was fully supplied by the one furnished by the salvors.

     *Also held,* on the evidence and pleadings, that the cause of the tug leaving the lee of the island was not due to the change or threatened change of wind to the southward, but to her scarcity of fuel, which was not sufficient to allow her to reach New Haven if she remained there longer, and that the want of an anchor on the boat did not contribute to diminish the supply of fuel, as the situation was such that the tug could not have safely allowed her fires to run down; that it was clearly negligence in the tug to attempt to tow a loaded canal-boat from New London to New York, at that season of the year, with so

short a supply of coal that in case of accident or stress of weather she could not be over under steam, in a place of shelter, in the course of her voyage, for the space of something more than 10 or 12 hours; and that to this negligence was due the abandonment of the boat, and the damage which followed; and the tug, being wholly in fault, is liable therefor.

Where the testimony showed that before the tug changed her course for Duck island, and at a point where she could have made Saybrook harbor, the sea became so rough that she could not safely continue her voyage,—

*Held*, that the subsequent disaster and damage were attributable to the tug's failure to take shelter in Saybrook harbor, which she ought, under the circumstances to have done; and that on this ground also the libellants are entitled to a decree.

In Admiralty.

*Carpenter & Mosher*, for libellants.

*Beebe, Wilcox & Hobbs*, for claimants.

CHOATE, D. J.   This is a suit brought by the owners of the canal-boat Lockport to recover damages alleged to have been sustained by the canal-boat and her cargo through the negligence of those having charge of the steam-tug.   The steam-tug was engaged to tow the canal-boat from New London to New York.   They left New London about 7½ or 8 A. M. on the fourth day of November, 1880.   The canal-boat had on board 210 tons of pea coal and coal-dust.   Her carrying capacity was about 325 tons.   She was loaded by the stern, drawing about five feet forward and seven and a half feet aft.   When they left New London the canal-boat was along-side.   When they got out of the river she was dropped astern upon a hawser.   When they left the weather was fair, with the wind from east to north-east, blowing moderately.   They went to the south of *Bartlett's* reef, and thence by the channel to the south of Long Sand shoal.   Before they reached the west end of Long Sand shoal, the wind and sea had risen so that the canal-boat became unmanageable, yawing so much that she pulled the tug around into the trough of the sea.   The wind was then about east, and the tide was setting also to the westward.   One of the questions in the case is at what part of the passage the wind and sea thus rose; but there is no controversy that this was the state of the case when they reached the west end of Long Sand shoal.   From that point the pilot of the tug thought it necessary to seek a place of shelter, and he changed his course to go under the west side of Duck island, which affords a lee, with an east wind, and which was the nearest place of shelter from the vicinity of the west end of Long Sand shoal.   They reached the west side of Duck island about 2 o'clock in the afternoon.   Before reaching Duck island, but whether before or after they changed

their course for that place it is almost impossible on the evidence to determine, the tiller of the canal-boat broke close to the rudder head, thus increasing greatly her unmanagebleness. The libellant testifies that this was after they turned to go in under Duck island; that the tiller was lashed at the time, and he was forward attending to putting on the hatches, which had become necessary, because in going in towards Duck island the boat was exposed to a cross sea, and more liable to ship water on her deck. Great doubt is, in my judgment, thrown on his testimony as to the time when the tiller broke by the other testimony in the case; but, in the view which I have reached as to the subsequent incidents of the voyage, this point is not material. The storm had become very violent by the time they got under the lee of Duck island, but this afforded them a safe place of shelter as the wind then was. On reaching this place they anchored. It was then found that the canal-boat had no anchor. With the tide then running there was a current setting towards the shore, which was about two miles distant, and the anchor of the tug was found insufficient to hold both tug and canal-boat, and they dragged slowly towards the shore, so that it was necessary to work out and anchor again, which was done. As they still dragged, they abandoned the plan of lying at anchor, and circled round and round, keeping under the lee of the island. They kept this up till some time in the night, not later than 2 o'clock A. M. of November 5th, when they started out for New Haven, the tug towing the canal-boat astern by two or three hawsers. The testimony of some of the witnesses is that they left the shelter of Duck island to go to New Haven about 2 o'clock. It is also testified that they arrived at New Haven at 4 o'clock in the morning. There is a mistake in one or the other of these times, because it seems not possible that they could have made the passage, about 17 miles, in two hours, especially as the tug was encumbered by the canal-boat during the first part of the passage, estimated variously by the witnesses from one mile to three or four miles. The pilot of the tug testifies that during the first part of the voyage from New London, when they had no great difficulty in towing the canal-boat, they made about three miles an hour. Their progress must have been much slower while towing her from Duck island, with a very rough sea, and no tiller to aid in steering the canal-boat. It is not, however, material whether they left Duck island as late as 2 in the morning or as early as midnight. I think on this point the statement in the answer that they left about 10 minutes after 12,

midnight, is probably correct. After getting out into the sound, somewhere between a mile and three or four miles from their place of shelter, they cast the canal-boat adrift, taking her master on board the tug, with his personal effects, and the tug proceeded to New Haven. I think the testimony fully sustains the claim of the owners of the tug that when they cast the canal-boat adrift she was so unmanageable from the combined effect of the severity of the storm and her want of steering gear that it was impossible to tow her longer with safety to the tug. I think, also, the evidence shows that when they started with her for New Haven from under Duck island, the pilot and the master of the tug expected to be obliged to cast her adrift in the sound, and not to be able to tow her into New Haven. Whether they intended, when they started, to cut her adrift or not, it was a result obviously likely to happen in her condition, and with the wind and sea as they then were.

One of the principal questions in the case is, what was the reason that compelled or induced those in charge of the tug to go out from under the shelter of Duck island in the violent storm then raging in the night-time, instead of waiting where they were till the storm should subside, or until daylight should come, when many opportunities of relief were likely to be offered to them? It is the claim of the libellant that the sole cause of their thus going out and exposing the tow to this danger was that the tug's fuel was so far exhausted that they could not remain longer without running the risk of getting out of coal before they could reach New Haven. And it is alleged as one act of negligence on the part of the tug, leading to the disaster, that the tug had not a sufficient supply of coal on leaving New London. This point will be hereinafter considered. The next morning the master of the canal-boat went in search of his boat. Following the shore westward he found that she had drifted into the mouth of Guilford harbor, and had been rescued by parties discovering her there and brought into Guilford creek, where he found her in charge of the salvors who had brought her in. She was apparently uninjured, and lay there in a narrow channel, anchored with an anchor which the salvors supplied her with. Up to this time her owners had sustained no actual damage by her being cast adrift on the sound, except the amount due the salvors, which was the very reasonable sum of $100, which sum they demanded, and which the owners of the canal-boat have paid. It is the claim on the part of the tug that the damage afterwards sustained, which was caused by her getting across the

narrow channel, and being thereby strained and hogged, is to be attributed to the fact that she was not equipped with an anchor, and to the negligence of her owners in not sooner getting her out of the dangerous place in which she was lying, or in not finding for her in Guilford creek a safer place to lie in; and that this subsequent damage is not properly attributable to the casting of her adrift on the sound, even if the tug is responsible for the damages directly arising from so leaving her adrift. No doubt it was incumbent on the master of the canal-boat, who was also one of the owners, to take all reasonable measures for the prompt rescue of his boat from the perilous position in which she had been put. But, without going at length into the evidence, it is enough to dispose of this point to say that upon the proofs he acted with diligence and reasonably good judgment in his endeavors to rescue her, but before he could succeed in doing so a severe southerly storm came on, which drove the sea into Guilford creek, caused her to drag her anchor, and was the means of her getting across the channel, so that when the tide fell she was badly injured, her center sinking down some three feet as she lay across the channel, with her bow on one bank and her stern on the other. Upon his discovering her in Guilford creek, her master returned to New Haven and endeavored to get the aid of a small tug which should be able to enter Guilford creek and tow her out. It is evident that the Fowler could not do this. She drew too much water to enter the creek. And it is evident, also, from the testimony of the master of the canal-boat himself, that he knew this, and did not expect or ask the captain of the tug to render this service, and that all the further aid he looked for, if any, from the Fowler was to tow her to New York after he had succeeded in getting her out of Guilford creek and had brought her to New Haven, which he gave the captain of the tug to understand that he was going to do. Nor does the evidence sustain the contention of the claimants that there was any safer place for the canal-boat to lie in, in or near Guilford creek, than that in which the salvors put her and where her master found her. As to the want of an anchor, assuming that a canal-boat upon a voyage from New London to New York is unseaworthy if she has no anchor, which is the contention of the claimants,—although there is a very considerable weight of evidence in the case that a custom or usage has grown up for the tug to carry ground-tackle enough to hold herself and the tow in case it becomes necessary to anchor, and for this class of coal-boats navigating the sound to go without an-

cnors,—yet it appears to me that this defect in the equipment of the canal-boat, if it was one, was fully supplied by her being furnished with an anchor by the salvors. That anchor was at least as heavy as anchors usually carried by canal-boats having anchors, and there is no rule of law nor any usage shown requiring a canal-boat to have more than one anchor. At the time she got across the channel she was properly equipped with an anchor. The fact that before that she had none is therefore immaterial. Her drifting into Guilford harbor, being rescued by salvors, and being temporarily anchored there, in a dangerous place, were all natural and probable consequences of her being cast adrift on the sound. If, therefore, the tug is found responsible for so casting her adrift, she is liable to these subsequent damages.

It is charged, also, by the claimant that the canal-boat's want of an anchor, while they were under the lee of Duck island, in some way was the cause of the damage which she suffered, or contributed to it. It is argued that the tug had an anchor which would hold herself, and that this was all she was bound to have; that if the canal-boat had had an anchor sufficient to hold her, there would have been a saving of fuel, and both vessels could have lain there safely at anchor till the storm abated. Even if the canal-boat had had such an anchor, there would have been no saving of fuel, unless the tug, while lying there at anchor, had let her steam run down or her fires go out. But the situation was such that it would neither have been safe nor prudent for the tug to do this. For the time being the position was safe, but with a change of wind to the southerly, which certainly was possible at any time, the island would cease to afford a lee; nor would it be prudent, with a strong current setting on shore and a storm raging outside, to have trusted tug or canal-boat to even apparently good anchorage without the means of aid by steam in case the ground tackle should prove insufficient. For these reasons I think that the want of an anchor on the canal-boat, at that time and place, neither caused nor contributed to the running down of the tug's fuel, nor to the subsequent disaster, if that disaster was caused by the tug being compelled to leave her shelter by want of fuel. On the other hand it is claimed, on the part of the libellant, that the want of a proper anchor and ground-tackle on the tug, to hold both tug and canal-boat, was a fault on the part of the tug which caused or contributed to the subsequent disaster. I think there is as little basis for this claim as for the claim that it was the want of an anchor on the canal-boat

that caused the damage.   There is great doubt on the testimony as to the size and weight of the tug's anchor.   The libellant testifies that he himself handled it alone and threw it overboard, and he estimates its weight at 75 pounds.   On the point of his handling it alone he is seriously contradicted, and I am unable to find this fact proved on his uncorroborated testimony.   On the other hand, the testimony of those on the tug is that it weighed from three to four hundred pounds. The proof is, however, that though the holding ground there is good, it was insufficient to hold the tug and this partly-loaded canal-boat. I should have little difficulty in finding this an insufficient equipment for a tug towing canal-boats in the sound, if this want of a heavier anchor had anything to do with the subsequent disaster; but I think it had not.   For the reasons given above, even if the anchor had held, the tug could not safely have let her steam run down in that situation, nor have safely remained there after her fuel was so far exhausted that she could not proceed under steam to New Haven, the nearest port of safety.   She certainly did not go out from under Duck island because she could not anchor there.   She had no difficulty in steaming round and keeping under the lee of the island, and might have continued to do so, if she had had fuel enough, till the next day.   While she did so she and her tow were safe.

Coming, then, to the question why the tug left the shelter of Duck island at the time and under the circumstances in which she did, the effect of the evidence in the case clearly is that she left then because her supply of coal was so nearly exhausted that she could not remain there longer without incurring the danger of her coal giving out before she could reach New Haven, which was the nearest place at which coal could be obtained.   The only other theory advanced on this point is that urged by the counsel for the claimants, that she went out because there were indications that the wind was hauling more to the southward, and if it had done so the west side of Duck island would have ceased to furnish a lee, and that it was therefore unsafe to remain longer.   There is no evidence whatever to sustain this theory, except the testimony of Captain Meyers, the master of the tug. The testimony of this witness is to be received with great caution. Not only is he interested to justify his conduct, but it appears that ever since the disaster, in November, 1880, till the time of the trial, in February, 1881, he had been employed by the owner of the tug in preparing the defence, in the case, and he manifested upon the trial, a great deal of earnestness in behalf of the defence.   So vital a point

as this in justification of the tug would, it seems, if true, have been set up in the answer, which was filed December 30, 1880. Yet not only is it not set up in the answer, but, on the contrary, the answer virtually admits that they left Duck island when they did because their coal was getting exhausted. Thus the answer states—

"That it was then found that the supply of coal necessary to run the engines of the tug was being rapidly consumed, and that the nearest point to replenish the said coal was at New Haven; that *in this emergency* it was deemed to be the most prudent course to tow the said barge out into the sound, where there would be a better chance of her being picked by some other vesssel or steamer, and at 12 o'clock and 10 minutes, midnight, of November sixth, [fifth,] the said tug and tow left the lee of the said island and proceeded for New Haven, in hopes that with a fair wind and tide she would be enabled to tow the said barge into New Haven, or some other place of safety," etc.

It seems to me quite inconsistent with this answer now to claim that there was any other reason for leaving the lee of the island, at a time and under circumstances almost certainly involving the risk of the loss of the tow, than the want of coal. Moreover, the pilot, Clifford, who was examined before the trial, and whose examination Captain Meyers attended, gives no testimony whatever tending to show that an apprehended change of wind had anything to do with their leaving the lee of the island. On the contrary, his testimony strongly confirms the libellant's charge that they left for want of coal. If anybody would have known of the fact that they left because of a change, or threatened change, in the wind, if that were so, it was Clifford, the pilot, who was the person actually having charge of the navigation of the tug. It is inconceivable that if Captain Meyers, at the time of Clifford's examination, had this point in his mind, and believed that the change, or threatened change, of wind was the reason for the movement, that he should not have attempted to prove the fact by the testimony of the pilot. Clifford is a disinterested witness, having no known bias in the case, unless to justify himself in his conduct of the voyage, and his testimony, where it makes for the libellant, is entitled to great weight. The testimony of the other persons on the tug, so far as it goes, aids the libellant on this point. They heard the matter of the want of coal talked about. One of them, a deck hand, called as a witness for the libellant, does indeed testify to having overheard the pilot say that there were indications of the wind hauling more to the southerly. There is no confirmation of this by any other witness. Even if it were said, I am satisfied, from the testimony of the pilot, that

the indications of a change of wind were not so decided, or so threatening, as to have operated on his mind as a ground for leaving the lee of the island when they did. I think, however, from the whole course of the trial, the state of the pleadings, and the testimony, that this piece of evidence first suggested to Captain Meyers, and his very astute counsel, the idea of setting up the justification of a change, or threatened change, of wind. Captain Meyers testified only to a change to E. by S., which still left the west side of the island a safe lee, and to *indications* of a further change. It is very easy for an interested witness to bring himself to believe that he noticed indications of a change of wind, but it is not satisfactorily shown that the tug and tow could not safely have waited, notwithstanding such indications, till the threatened change came in fact. When the island ceased to afford a lee, they would be no worse off than they were the moment they came out from its shelter. One circumstance of great weight against the tug is that, while they were under the lee of the island, they took coal from the canal-boat for the use of the tug. It was carried across in pails, only a small quantity, but all that the canal-boat had suitable for the use of the tug. This was a most absurd thing to do, unless the tug was getting very short of coal. Captain Meyers' testimony as to the amount of coal on board is also very conflicting. He first testified that they probably had seven tons when they left New London. The tug used about four tons in 24 hours. This would have left at least four tons, or 24 hours' supply, when they left Duck island. In another part of his testimony he says they then had enough for 12 hours, which would be but two tons. An ingenious attempt is made, by the testimony of witnesses as to the amount of coal taken on board before leaving New London and at New Haven, and the number of hours the tug ran without coaling afterwards, to show that she must have had a good supply of coal on board when she left the island. Such evidence is always liable to involve some error in a mistaken estimate of amount, or the misrecollection as to details, of some one of several witnesses, when examined a considerable time after the event. It is not sufficient to overcome the admissions of the answer, and the overwhelming weight of testimony, that it was this urgent necessity, and nothing else, which compelled the tug to take the desperate hazard of towing this disabled boat out into the sound on that stormy night.

Assuming this fact, then, as proved, the question is whether it is

negligence in a tug taking a loaded canal-boat in tow from New London for New York, at an inclement season of the year, to have so short a supply of coal that in case of accident or stress of weather she could not lie over under steam in a place of shelter, in the course of the voyage, for the space of something more than 10 to 12 hours. I have no hesitation in holding that this is negligence. Such accidents are ordinary incidents of such voyages, and should be provided against. This want of coal was the immediate cause of the abandonment of the canal-boat and of the damage ensuing therefrom to her owners, and on this ground the tug must be held liable. It is suggested by claimant's counsel that the tug was not responsible for the breaking of the tiller of the canal-boat, and that this was the cause of the disaster. It does not appear that the tiller was not a good and proper tiller, and the violence of the sea fully accounts for its breaking. This was not the fault of the tug unless she was at fault in exposing the canal-boat to such a sea—a point to be presently considered. But if the tug was not at fault in this respect, yet, undoubtedly, after the canal-boat was disabled, she was bound to use reasonable care in protecting her from the effects of the injury she had sustained, and was not justified in being provided with so small a supply of fuel that she could not meet so common an emergency as a detention of 12 hours by reason of an accident to the tow. It appears that the captain of the tug intended when he left New London to go into New Haven for coal. This seems to have been a violation of his agreement to tow the canal-boat to New York, which, in the absence of an understanding that he was going into an intermediate port, bound him to go directly to New York. The pretence of a custom of tugs with tows bound from New London to New York stopping at New Haven has no foundation in the evidence. But whether the supply of coal was intended for New Haven or for New York, it was clearly insufficient.

Another point made against the tug, that when they reached the east end of Long Sand shoal it was so rough that they were bound to go into Saybrook for shelter, is also, I think, made out by the evidence. The testimony of the libellant on this point is strongly supported by that of Clifford, the pilot. Neither the pilot nor the captain had any experience in towing loaded canal-boats on the sound, and the reason that Clifford gives for not going into Saybrook is that he was bound for New Haven. It was evident that he had little, if any, knowledge of Saybrook harbor and the entrance to it. Their

testimony as to the prudence or imprudence of keeping on their course along the South channel to the south of Long Sand shoal, instead of going into Saybrook, is entitled to little weight on account of their want of experience. But on the question whether, when they were at the point at which they should change their course to go in there, the wind and sea had risen so as to make it very dangerous to proceed on their course, the preponderance of the evidence is against them. This point being established, all the subsequent disaster and damage may be attributed to this failure to take shelter in Connecticut river, as their cause, and on this ground also the tug is liable.

Other points made on the trial may be very briefly noticed. The weight of evidence does not sustain the claim of the libellant that the wind and sea had risen so much when they came out of the river that the canal-boat was dropped astern because it could not be safely towed along-side. On the contrary, I think the evidence is that it was then fair weather and that the sea was smooth, and so continued for a considerable time. Therefore, the point made that they were bound to turn back at the mouth of the river is not sustained. I think, also, it is not made out to have been imprudent, as the weather then was, for the tug to proceed to the southward of Bartlett's reef instead of taking the Two Tree island channel, which some of the witnesses, experienced pilots, seem to prefer; nor, if the weather had continued fine when they reached the east end of Long Sand shoal, that it would have been fatally imprudent to have taken the channel to the south instead of the north of that shoal. Nor is it made out that the canal-boat could have been safely beached in the vicinity of Duck island, or that an attempt to do so would, under the circumstances, have been an act of prudence. But, on the two grounds above stated, there must be a decree for the libellant, with costs, and a reference to compute their damages.