THE CAYUGA.

1. Where, on a reference by a District Court sitting in admiralty to assess the damages done by a collision, the master after taking depositions reports a certain sum as due, but is not requested by the respondents in the case to return the testimony or his finding of facts into court, and though returning certain parts of the testimony, does not return the whole, nor any finding of facts, and the court confirms his report and enters a decree accordingly—a decree affirmed by the Circuit Court— this court cannot, in the absence of the testimony and where the record does not afford any satisfactory statement of facts to enable it to determine that there is any error in the report of the commissioner, review that matter.
2. A steamer condemned in damages for an accident occurring to her tow, which she was taking round a dangerous point with a very long hawser.

APPEAL from the Circuit Court for the Southern District of New York; the case as appearing from the weight of testimony being thus:

The Cayuga, a steamer engaged in towing canal-boats upon the Hudson River, took, on the 25th of May, 1867, the canal-boat Floating Battery, loaded with sand, in tow at Albany, to be brought to New York. The whole tow of the steamer consisted of thirty canal-boats and two barges, the latter being from 150 to 200 feet astern of the former. The canal-boats were placed in six tiers, each consisting of five boats, the Floating Battery being the starboard boat of the hindmost tier, bringing her the nearest to the west shore.

The distance from her to the Cayuga was about 1000 feet.

Upon the first night out, the Floating Battery was brought in contact with a lighthouse near Coxsackie, with such force that her lines parted and she was separated from the tow. She was replaced, however, in her old position by the aid

of a passing steamer without much difficulty. After this she leaked a little, " about as much in twenty-four hours as a man could pump out in an hour." The evidence was clear that prior to this accident she was uncommonly dry and free from leaking. On the morning of the 28th of May, at about 12½ o'clock—the canal-boat having been but a short time before pumped out—as the steamer with her tow was rounding West Point, the canal-boat struck something (a submerged rock the libellants alleged), upon her starboard side, with such force as to throw her captain, who was lying down in the cabin, out of his berth, and—the blow being a "sagging blow"—to cause the boat to strike her companion upon its port side with great violence, sending the latter against its neighbor. At this time the canal-boat was not more than ten feet from the rocks upon the west shore; " so near that a man could have jumped from her upon those rocks."

As soon as the captain could gain his feet, he rushed upon deck, and being convinced that the boat was sinking, he and the bowman went immediately into the cabin for the purpose of securing their personal effects. When they reached it they heard the water rushing into the boat, and before they had procured their clothes the water was upon the cabin floor.

The helm was then lashed to port to send the boat to shore. By this time she had sunk so rapidly that the water was rushing in at the cabin windows, within a few inches of the deck. This was only two or three minutes after the blow. The lines connecting her with the next boat were then cut, her men stepping upon the boat upon her port side.

Two witnesses, standing upon the next boat to the canal-boat which was struck, close to her, who were not interested in any way in the cause, testified positively that they saw her sink stern foremost. No horn was blown after the canal-boat received her blow, nor any lantern swung: the usual signals from a vessel in tow to her steamer when desiring aid. The steamer did not stop, and her officers knew nothing of the accident to the canal-boat until the next morning.

A light that had been seen on the canal-boat, it appeared, had been seen for a considerable time, perhaps half an hour, after the accident. The only light, however, on the canal-boat was from a sheet-iron stove, which weighed about fifty pounds, and was placed upon a movable galley, not fastened to the deck. When the boat sank, the galley might have floated, the stove not being heavy enough to sink it.

The owners of the canal-boat having libelled the steamer in the District Court at New York, that court entered a decretal order in favor of the libellants and referred the cause to a commissioner to assess the damages. He took depositions and reported the value of the boat and cargo at $2329.92. The owners of the steamer excepted to the amount allowed, but they did not state what would have been a fair allowance for either boat or cargo, nor did they request the commissioner to report the evidence or his finding of the facts.

Some testimony was given in the record as having been taken before the commissioner, but it was not certified that it was all that was put before him. The District Court confirmed the report of the commissioner and entered a final decree in favor of the libellants. The owners of the steamer thereupon appealed to the Circuit Court, where the decree of the District Court was affirmed. They then appealed to this court, and the case was here upon the same testimony as that introduced in the courts below.

*Mr. Van Santvoord, for the appellants,* sought from an ingenious collocation of the evidence to show that the vessel had not struck a rock near the shore as the steamer turned at West Point, or that if she did, she certainly did not sink immediately, as two of the witnesses had testified. Her *light* had confessedly been seen for half an hour after the accident, which showed that these witnesses could not possibly have spoken the truth. She was therefore afloat for some minutes after the accident.

In these contracts for towing, says Lord Kingsdown, delivering the opinion of the court in Privy Council, in *The*

*Julia,*\* the law implies an engagement that each vessel will perform its duty in completing it; that proper skill and diligence would be used on board each; and that neither vessel by neglect or misconduct would create unnecessary risk to the other, or increase any risk which might be incidental to the service undertaken. The obligation of the steamer to complete her contract, or to do what might be necessary to save the boat towed not being discharged by an accidental interruption or injury,† the cutting the boat loose without such notice or alarm, if not an act creating unnecessary risk to the steamer, was an act greatly increasing the risk incidental to the service undertaken by the steamer. And this clear breach of duty is not less available as a defence, even if it were doubtful whether such notice would have been of any avail.‡

In addition, the master of the canal-boat, in cutting her loose without any signal by swinging a light or other effectual alarm to the steamer of her condition, was clearly guilty of negligence and breach of duty, which should be held to release the steamer of any obligation which she would otherwise have been under to take the requisite measures to provide for the safety of the canal-boat and to discharge the steamer from the damages consequent upon the loss of the boat and the cargo thereafter.

The learned counsel, relying on the evidence that had come up in the record as to the value of the canal-boat and cargo, argued that the sum given by the commissioner was excessive; that if the owners of the steamer were liable at all, they were not liable for so much (being the greater part thereof) as might have been saved by reasonable notice to the persons in charge of the steamer of her condition, when measures would have been taken to save, if not the whole boat and cargo, at least some part of them.

*Mr. J. C. Carter, contra,* contended that the case was a clear one. The steamer in rounding a dangerous point, and

---

\* 1 Lushington's Admiralty, 224–231.     † The Annapolis, Ib. 355.

‡ Cramer v. Allen, 5 Blatchford's Circuit Court, 248; and see Muddle v. Stride, 9 Carrington & Payne, 380.

doubtless in a critical state of the tide, had let a very large and, of course, unmanageable tow follow with too long a hawser. The sinking in two or three minutes was testified to positively, and any light that had been on the boat which was seen for half an hour after the blow, was one floating on her galley after she had sank.

As to the other point, the damages on their face were not unreasonable. Moreover, the record does not present enough evidence for this court to review them.

Mr. Justice CLIFFORD delivered the opinion of the court.

Damages are claimed in this case by the owners of the canal-boat Floating Battery, against the steamboat Cayuga, in a cause of tort civil and maritime, for the loss of the canal-boat and her cargo, consisting of two hundred and twenty-five tons of moulding sand, which the libellants had engaged to transport from the port of Albany and to deliver in the city of New York to certain consignees.

Employed as the steamboat was in towing boats and barges between those ports, the owners of the canal-boat, on the twenty-fifth of May, 1867, applied to the agent of the steamboat to take the canal-boat in tow, and he undertook and contracted to tow the canal-boat, as requested, to her port of destination; and it is alleged that the steamboat, in the evening of that day, took the canal-boat, with other boats and barges, in tow, and proceeded down the river in execution of the contract. Besides the canal-boat of the libellants the steamboat had twenty-nine other canal-boats in tow, and two barges, the canal-boats being arranged in six tiers of five boats each, the canal-boat of the libellants being the starboard boat of the hindmost tier, and nearest to the west shore. By the record it appears that the whole six tiers of canal-boats were towed by hawsers from the stern of the steamboat extending aft from eighty to one hundred fathoms, which were fastened to the foremost tier of the canal-boats, showing that the canal-boat of the libellants was more than a thousand feet astern of the steamboat when the whole were in motion, as the canal-boats are about a hundred

feet in length. All the canal-boats except the first tier were propelled by lines from the stern of the canal-boat immediately ahead, and they were kept in their places by breast-lines. Arranged as described the steamboat with her tow, including also two barges of a larger class than the canal-boats, and propelled by long hawsers extending aft from the stern of the steamboat a distance of a hundred and fifty feet further than the last tier of the canal-boats, proceeded down the river; but it appears that the canal-boat of the libellants was brought in contact, during the first night of the trip, with a lighthouse in the river, with such force that her lines parted and she was separated for a time from the other canal-boats of her tier. Prompt measures were adopted to pick her up, and she was soon, by the aid of another steamer, replaced in her former position as the starboard canal-boat in the sixth tier of the tow. Prior to that accident the evidence is clear and undisputed that the canal-boat of the libellants was stanch, tight, and in every respect in good condition, but she received some injuries by the collision, causing her to leak a little, making it necessary to use her pump, say for an hour once in twenty-four hours, showing that she was still seaworthy and not disabled. On the morning of the third day of the trip, about half-past twelve o'clock, as the steamboat, with her thirty canal-boats and two barges in tow, was rounding West Point, the canal-boat of the libellants struck some object in the water, her starboard side coming in contact with it with such force as to throw her master from his berth, in which he was lying, and to cause the boat to career and strike the boat on her port side, sending the latter against the next boat in the same tier with great violence. Injuries of a very serious character were occasioned by the accident to the canal-boat of the libellants. Her planks below the water-line on the starboard side were broken to such an extent that she filled with water with such rapidity as to prevent the master and bowman from securing their clothing, which was below, and to cause the canal-boat with her cargo on board to sink in two or three minutes. Process was issued and served and the respond-

ents appeared and filed an answer. Testimony was taken, and the District Court entered a decretal order in favor of the libellants and referred the cause to a commissioner to compute the amount of the damages. Hearing was had before the commissioner and he reported that the damages amounted to $2329.92.

Exceptions were taken by the respondents to the amount allowed by the commissioner as the value of the canal-boat, and also to the charge for the value of the cargo, but they do not state what would have been a proper allowance for either charge, nor did the respondents request the commissioner to report the evidence or his finding of the facts. Certain testimony is given in the record as having been taken before the commissioner, but it is not certified that it is all the testimony introduced before him, nor does the transcript afford any satisfactory statement of facts to enable the court to determine that there is any error in the report of the commissioner. Pursuant to that view, doubtless, the District Court confirmed the report of the commissioner and entered a final decree in favor of the libellants, and the respondents appealed to the Circuit Court, where the decree of the District Court was affirmed. Whereupon the respondents appealed to this court and now submit the case upon the same testimony as that introduced in the subordinate courts, and ask to have the decree of the Circuit Court reversed.

Most of the material facts touching the merits are either admitted by the respondents or so fully proved as to supersede all necessity for much discussion of any such topic. They admit that their agent undertook and agreed to tow the canal-boat of the libellants from the port of departure to her port of destination, and that having undertaken to perform the stipulated service they were under obligation to see that it was performed with ordinary and reasonable care and skill, and that they would be liable if they or those in charge of the steamboat were guilty of any such negligence in the performance of that duty as caused the loss of the

canal-boat and her cargo. Conceding all that, still they deny that they or those in charge of the steamboat are responsible for the disaster, but contend that the same was caused either by the unseaworthiness of the canal-boat, or the neglect and fault of her crew or those in charge of her, in not using her pumps, or in failing to stop some leak, or other neglect or fault of those parties for which the respondents are not responsible. Mismanagement and fault are imputed to those in charge of the canal-boat as follows: that they cut the canal-boat loose from the other boats in the tier as the steamboat with her tow rounded West Point, and while she was proceeding down the river in her proper course, and the charge is that they did the act from an apprehension that the canal-boat was in a sinking condition, and without any notice or alarm to the steamboat or to those intrusted with her navigation; and they deny that the steamboat was so navigated as to cause the canal-boat of the libellants to strike against the rocks at that place, or that her bottom or side was broken by any such casualty as that alleged in the libel, or that those in charge of the steamboat were guilty of any fault, negligence, or carelessness. Such denials cannot avail the respondents, as the evidence to prove the allegations of the libel is full and satisfactory and abundantly sufficient to show that the decision of the subordinate courts is correct.

Attempt is made in argument to convince the court that considerable time elapsed after the canal-boat of the libellants was cut loose from the other canal-boats in the same tier before she sunk, as tending to show that the final disaster was attributable to the mismanagement of those in charge of the canal-boat in cutting the lines which held her in the tow. Having lashed her helm to port they cut the lines which held her in her position that she might go ashore, which it seems would in all probability have occurred if the canal-boat had continued to float, but the evidence satisfies the court that she filled with water and sank before there was time for any such hope to be realized. Inferences of an opposite character are drawn by one or two

witnesses of the respondents, but they have no actual knowledge upon the subject, as is clear from their own statement. They infer that the canal-boat continued to float down the river for some time after she received the injuries because they saw, as they suppose, a light floating upon the water, which it is quite as probable was a light on the shore or the light in the galley of the canal-boat, as that, not having been fastened to the deck, might not have been submerged in the disaster to the canal-boat and her cargo.

Suffice it to say that the evidence that the canal-boat sunk in two or three minutes from the time she received the injuries described is such as to convince the court that it is true, and that the statements of the other witnesses, not being founded upon actual knowledge, are not sufficient to support the allegations of the answer.

Nothing further need be remarked in respect to the charge that the master of the canal-boat was guilty of mismanagement, as it is clear that the charge is without any support, and it is quite clear that the exceptions are not of a character to enable the court to review the findings of the master.

DECREE AFFIRMED.