## THE INCA.

### SOUTH ATLANTIC TOWING CO. v. SWAN et al.

(Circuit Court of Appeals, Fifth Circuit. November 3, 1906.)

#### No. 1,596.

TOWAGE—LOSS OF TOW—LIABILITY OF TUG FOR GROUNDING OF TOW.

Conflicting evidence, taken chiefly in the presence of the trial judge, *held* to support his findings that the sinking of a bark in tow in the Satilla river, Ga., while being towed down to sea laden with lumber, was due solely to the fault of the tug in allowing the bark to ground upon a mound of stones to one side of the channel, which had been there for many years, and was generally known to navigators of the river, but was unknown to the master of the tug, and afterward in pulling her off, instead of waiting for her to be floated by the rising tide; the result being such injury to her bottom that she sank at once.

Appeal from the District Court of the United States for the Southern District of Georgia.

For opinion below, see 130 Fed. 36.

William Garrard and P. W. Meldrim, for appellants.

Walter G. Charlton, for appellees.

Argued before PARDEE and SHELBY, Circuit Judges, and MEEK, District Judge.

MEEK, District Judge. This cause comes up on appeal from the decree of the District Court of the United States for the Southern District of Georgia, sitting in admiralty. The libel in rem was filed by John Swan and others, owners of the bark Justine H. Ingersoll, against the steam tug Inca, then lying in the port of Brunswick, Ga. The South Atlantic Towing Company, owner of the tug, intervened as claimant. The trial below resulted in a decree in favor of the libelant against the defendant, the claimant, and a surety company (the tug having been released to claimant on bond), for the sum of $6,700.89. From this decree claimant appeals.

The Justine H. Ingersoll took on a cargo of 373,000 feet of lumber at the Hilton & Dodge Mills, a point up the Satilla river, in the state of Georgia, about 18 miles from Saint Andrew's Sound. Her destination was New York, via the river and the sound, and she was ready to begin her voyage on February 8, 1903. The steam tug Inca was engaged to carry her to sea, and for this purpose took her in tow at the mills about 1 o'clock p. m. of that day. The bark was 142 feet long, and, loaded, drew 17 feet 3 inches aft, and 16 feet 6 inches forward. The Satilla river is a navigable river at the point where the bark was lying, having an ebb and flow tide, with a rise of about 6 feet, and with sufficient draft to float the bark in safety. The tide began to flow in about noon, and the voyage was commenced on a young flood. The hawser, with 350 feet of length, was made fast on the bark to her port bow and at the stern of the tug to her starboard bitts. While going around a curve or bend in the river, about a half mile from the place of starting, the bark, while being drawn by the tug, was run upon a mound of rock or ballast that had been sunk in the river years before. The river at this point was from 375 to 390 feet wide. The channel was 200 feet wide, with a depth of water of from 28 to 30 feet, and, going down, was to the right or starboard of the stream. The mound of rock was on the port side of the channel, and in the curve or bight of the river. The bark struck and stuck between the foot of her mizzenmast and stern. The tug made three efforts to pull her off the obstruction, and finally succeeded on the third. While pulling at her for this purpose, her rudder came up, and in coming off the obstruction she lost her shoe, and was so injured otherwise that she filled, and sunk in 5 or 10 minutes. A survey was held upon the bark after sinking, and, as repairs would have cost $10,000, it was recommended by the board of surveyors that she be sold as she lay, which was done. She was almost a total loss, bringing but $725 at the sale. This amount was bid largely for her apparel and furniture.

The faults charged against the master of the Inca were, substantially, that he failed to exercise ordinary and reasonable care and caution and maritime skill—first, in towing the bark on the stage of tide then existing; second, in handling the bark immediately before and at the time and place of grounding; and, third, in his efforts to get the bark off the obstruction. The contentions of the claimant

were that the bark was unseaworthy, and that she was not steered in the wake of the tug, but permitted to sheer off to port, thus bringing herself upon the mound of rock.

When the master of the bark engaged the services of the steam tug to carry her to sea, and the tug assumed the task, the latter was in control, and became the dominating mind in the undertaking. White v. Steam Tug Lavergne (D. C.) 2 Fed. 788; The Annie Williams (D. C.) 20 Fed. 866; The Express, 3 Clif. 462, Fed. Cas. No. 4209. In the relations existing between the steam tug and the tow, duties were imposed upon each. The conditions under which the venture was to be undertaken were confided to the tug. Her holding out for this service implied a knowledge of the conditions of the stream, channel, and tide that were to be met, so far as reasonable maritime experience and efficiency as pilot in this river could inform her. It was for her to determine the hour of starting; to fix the relative positions of the tug and tow; to control the length of hawser; to regulate the speed of the vessels according to the exigencies of the voyage; to give necessary instruction to the tow for its movements and safety. The correlative duties of following the guidance of the tug, to keep as near as possible in her wake, and to conform to her directions, were imposed upon the tow. The exercise of reasonable care and skill within this sphere were incumbent upon her. The Margaret, 94 U. S. 497, 24 L. Ed. 146; The Fannie Tuthill (D. C.) 12 Fed. 446.

Entering upon a consideration of the faults charged against the tug, it appears that the warning testified to have been given the master of the tug as to the dangerous stage of the tide upon which he was undertaking the tow had peculiar reference to shoals in the river that had to be passed several miles below the point of grounding. Probably, had the tide been at full flood at the time of starting, the stone mound would not have been an obstruction, and the bark could have passed over it in safety. But the channel of the river 200 feet in width was navigable, irrespective of the stage of the tide.

As to the manner of handling the bark immediately before and at the time and place of grounding, it is shown that the Satilla is a muddy, fresh-water stream; that the master of the tugboat had an experience of 15 years as a pilot, and was accustomed to ply his vocation on this river; that he did not know of the stone mound sunk in the river at this point, although it had been made many years before by vessels dumping their ballasts of stone, and was known by other pilots on the river. In one instance the knowledge of its presence had been handed down from father to son. These circumstances, taken in connection with the ebb and flow of the tide and the consequent changing of depths and currents, with the draft of vessels plying there, and with the configuration of the banks of the river, made it incumbent upon him to be advised of its presence. If the accident resulted through his ignorance of this known obstruction to navigation, the owners of the tug would be liable. The Margaret, supra; The Florence (D. C.) 88 Fed. 302; The Robert H. Burnett (D. C.) 30 Fed. 214.

As to what transpired immediately before and at the time of the grounding, we quote from the opinion of the learned trial judge, who manifestly gave attentive consideration to the case:

"It appeared from the evidence at the time of the misadventure, she [the tug] was going ahead with all her power. Taking the diagram as true, in connection with the testimony of Floyd, the master of the tug, we discover these facts: The river is 375 or 390 feet wide at the point where the Ingersoll grounded. This was on the port side of the vessel, and on the left-hand side of the river. The channel was 200 feet wide. According to the testimony of Floyd, the obstruction which caused the loss of the vessel was 60 feet to the left-hand edge of the channel. The bark was 142 feet long and 40 feet wide, and it is safe to conclude that if all Floyd said was true, around the natural sweep of the tow at the end of a hawser 300 feet long would have carried the tow to the point where she struck. There were peculiar reasons, therefore, why the tow should have received the most careful instructions to avoid this danger. There was at least 24 feet of water everywhere in that neighborhood, except on these ballast mounds. Besides, the master of the tug must have known that while she was going around the bend, the strong flood tide striking the tow on the starboard bow would have a tendency to bear her off to port and on these obstructions. That she was wobbling, and that she was following her own course, Floyd testifies. It does not appear, nor is it pretended, that any caution was given by any one aboad the tug. It appears, moreover, that she did not strike the obstruction with her stem, and as she went out of the way only 60 feet from the edge of the channel and came upon the rocks under her mizzenmast, the probabilities are very strong that if Floyd's testimony is true, that her sagging or divergence from the channel was due to the curve of the river and the force of the tide, and, not to any fault or misconduct on the part of the tow. But if the testimony of the officers and the available members of the crew of the Ingersoll can be accepted, the facts illustrate conduct on her [the tug's] part far more inculpatory. Not only does it appear from this evidence that after having been warned, the master of the tug started the voyage at a dangerous stage of the tide, but that he kept down the left side of the river, and dragged the bark directly on the ballast mounds. When notified by the cries from the tow that the bark was aground, he slacked the hawser, and she floated. He then started ahead again, and dragged her further up on the mound, where she stuck. It is then contended by libelants that, instead of waiting for the rise of the tide, which in a little while would certainly have floated her, notwithstanding the protests of the master of the tow, who cried out that he was damaging the tow, Floyd tried to 'twist' her off by alternately slacking or slowing down, and then going ahead at full speed. His own testimony on this subject is exceedingly injurious to his side of the case. He said: 'I pulled her just as hard as I could pull her, right straight down the river. I kept her as near heading down the river all the time as it was possible for me to do with my boat.' He was asked, 'How far starboard did the tide swing the vessel? Answer. It swung the vessel until she headed almost across the river.' This was when her bottom was on the rock. He continued: 'When the vessel swung, it carried the tug around with her. Pulling all we could pull, the tide carried the vessel's bow right around after her, so as to be nearly about across the river. After the vessel had swung around as far as she was going, I held up pulling for a few minutes. Question. For what purpose did you stop? Answer. I did not want the vessel to swing any further. Question. You waited a few minutes? Answer. After I found that the vessel had stopped swinging, I slowed the boat down a little; gave one bell. I waited for about ten minutes, and then I, what we call, "hooked" her up again—that is, rang the jingle bell—and that pulled the vessel's head down the river then about a point and a half or maybe two points; not over two points. I found she was not going any further. I slowed the boat down again, and waited about fifteen minutes, and then hooked the boat up again, and the vessel jumped right off the obstruction, just slid off, and swung around behind the boat, and you could see the vessel settling down in the water. Question. She sunk immediately? An-

swer. Yes, sir.' Now, it does not seem difficult to discover bad judgment from these facts. It is not difficult to account for the injury to the Ingersoll which caused her to sink in five minutes. It is plain that her bottom under the mizzenmast was ground into nothingness by the alternate action resulting from pulling with full speed and slowing up on the part of the tug. It will be observed that the hawser from the tug was attached to the port bow of the Ingersoll. The Ingersoll was grounded near her stern. She was not so fastened, however, but that the tide readily swung her up stream. The resistance of her full length was offered to the tide when the tug would slow up pulling. This would make her swing with the tide, and when it would go ahead at full speed, superadd to the power of the tug the power of a mighty lever to be found in the bark, 142 feet long, which was constituted by the hull of the ship. This would impart reverse action. It is probable that there are not many wooden vessels which could have long withstood this grinding movement, and when in a few minutes the tide had arisen sufficiently to float her, she immediately sank. It is true that a number of witnesses from Brunswick, where the tug is owned, testified that this was the proper way to get the tow off, but two or more were stockholders in the defendant company, and the court does not feel obliged, on account of expert testimony of this sort, to disregard what seems to be obvious inference, even from the evidence of Floyd. Since subsequent soundings also made by Floyd at the equivalent stage of the tide found 17 feet of water on this mound, it does not admit of a doubt that an exhibition of a half hour's patience would have floated the bark off without damage. It may have been desirable on his part to make haste in order to cross the shoals below, but it was much better to lose a tide than to lose a ship. An attentive consideration of the evidence satisfies the court that, notwithstanding the irreconcilable conflicts in the evidence, the testimony of the witnesses for the libelant is entitled to credence. Capt. Christopher Edwards appeared and testified orally, and seemed to be telling the truth. The testimony of the master of the tug seems incredible. He testified that nobody on the bark sung out or gave any call to him for help in all the time the bark was fast. In view of the imminent peril of the bark, the fact that she was aground for nearly a half hour, the contradictions by the libelants, and the utter improbability of this statement, it is wholly disregarded by the court, and throws the gravest doubt on all the testimony of Floyd."

The testimony in the trial below on the merits, with the exception of that of one witness, was given in the presence of the judge. It was in a remarkable degree conflicting on many of the issuable questions of fact. The line of cleavage between the witnesses for libelant and claimant is clearly marked by their testimony, which cannot in any view of the transaction be harmonized. The judge sitting at the trial can see the witnesses, hear their statements, observe their demeanor, and compare their varying degrees of intelligence. In this he has a decided advantage over an appellate tribunal in discovering where the truth lies, and coming at the real nature of the transaction. Because of this, his findings of fact are entitled to consideration and weight. The Quickstep. 9 Wall. 665, 19 L. Ed. 767. Every reasonable presumption in favor of their correctness should be accorded them, and they should not be set aside or modified unless it clearly appears he has fallen into error or mistake. Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; Southern Pine Company of Georgia v. Savannah Trust Company (C. C. A.) 141 Fed. 802. In this case the findings of fact by the trial judge are, in our opinion, supported by a preponderating weight of the evidence. His deductions and inferences therefrom are, for the most part, just and fair. We conclude that the tug was at fault in bringing her tow upon the obstruction, and that she was

also at fault in the method adopted to bring her tow clear of the obstruction. She failed to bring to the performance of the duty she assumed reasonable skill and care, and to exercise this skill and care in each step of her work, as she was bound to do. The Margaret, supra; The Quickstep, supra; The Cayuga, 16 Wall. 177, 21 L. Ed. 354; Hughes on Admiralty, p. 123.

But one other question requires consideration. It is contended by claimant that the bark was unseaworthy; that her inherent weakness and decay caused her destruction. It is well settled that the master of a bark offering her for towage represents her as sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. The Edmund L. Levy, 128 Fed. 684, 63 C. C. A. 235, and cases there cited. It is true the Justine H. Ingersoll was an old bark. She was built in the year 1876 at a cost of $34,000. She had been overhauled and repaired at intervals, the last time prior to her loss being in the year 1901. She was then classed as A 1½, which classification obtains for four years. Vessels of that class are regarded as fit for the carriage of all kinds of cargo on all voyages. She sailed in the latter part of November, 1902, from New York to Porto Rico with a cargo of general merchandise, including much refined sugar and paper. From thence she sailed to the Brunswick bar, and was towed up the Satilla river for her cargo of lumber. There is a sharp conflict in the testimony with relation to the condition of her keel and hull at the time of the accident. This evidence, however, was not introduced at the hearing on the merits, but was brought forward before the commissioner, when the case was referred for the taking of testimony as to damages. On the hearing before the judge there was no substantial contention that the bark was unseaworthy. We are of the opinion the testimony adduced before the commissioner was not sufficient to cause the trial judge to recede from his entertained view that the bark was staunch and sound. Besides, we are not prepared to hold that the misadventure resulting in the bark's loss was one of the ordinary perils to be encountered on the voyage down the Satilla river. The tug was not privileged negligently to run the bark on the mound of rock because she was old. Pettie v. Boston Towboat Company, 49 Fed. 466, 1 C. C. A. 314; The Jonty Jenks (D. C.) 54 Fed. 1021. The amount of damages awarded is not deemed excessive, and will not be disturbed.

The decree of the trial court is affirmed.