SOUTHERN TOWING CO. v. EGAN (two cases).

(Circuit Court of Appeals, Fourth Circuit. November 10, 1910.)

Nos. 920, 921.

1. TOWAGE (§ 4*)—DUTIES OF TUG TO TOW—LIABILITY FOR LOSS OF TOW.

A towing boat is not an insurer of the safety of the tow nor has she imposed on her the obligations of a common carrier, but those charged with her management are required to exercise reasonable or ordinary care, caution, and maritime skill in the performance of the service undertaken, and, if these are omitted and disaster occurs, the towing boat is responsible.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. TOWAGE (§ 19*)—LOSS OF TOW—LIABILITY OF TUG.

The tug Dixie of 50 tons net and 225 indicated horse power left Baltimore for Norfolk and beyond with 5 heavily laden barges. At 4 o'clock in the afternoon the weather became threatening, the wind increasing and the barometer falling, and conditions became worse during the night. At midnight the wind was flawy and the barometer falling rapidly, culminating in a gale and violent storm at 4 in the morning, and at 7, finding it impossible to withstand the storm, the tow anchored, the barges cutting loose and anchoring separately. One of the barges foundered, and all on board were drowned. During the night the tow passed two or three harbors where a safe anchorage could have been made. It was customary for tugs of the Dixie's class to take tows of that size down the bay, but except in favorable weather, without much adverse wind or sea, they were not able to manage such a tow. *Held* that, in view of the heavy tow, it was particularly incumbent on the master of the tug to exercise care in guarding against probable storms, and that under the circumstances his failure to seek a harbor was reckless, and not in the exercise of the seamanship and care demanded, and rendered the owner of the tug liable under the law of Virginia for the death of the master and mate of the barge.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 41; Dec. Dig. § 19.*]

Appeals from the District Court of the United States for the District of Maryland, at Baltimore.

Suits in admiralty by Sarah J. Egan, administratrix of the estates of John J. Egan and John Egan, respectively, against the Southern Towing Company. Decrees for libelant, and respondent appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

These are appeals from two decrees of the United States District Court for the District of Maryland, entered on the 15th day of March, 1909, in favor of the appellee, libelant in the lower court, against the appellant. The two cases were by consent heard together in both courts, though separate decrees and separate appeals were taken. The libels were filed under the Virginia statute (Code Va. §§ 2902, 2903), giving a remedy for loss of life by wrongful act of another, to recover damages arising from the drowning of libelant's husband, John Egan, and son, John J. Egan, by the sinking of the barge Frank W. Cumminsky, Jr., on the 9th day of April, 1907, in the waters of Chesapeake Bay, and within the territory of the state of Virginia, they being, respectively, the master and mate of the barge. The barge was the fourth of five in tow of the tug Dixie, owned by the appellant, en route from the port of Baltimore, Md., to the ports of Norfolk and Richmond, Va. The Dixie was a tug of 50 tons net, 225 indicated horse power. The 5 barges were heavily laden, of the average of 375 tons net, and the forward barge was on a hawser of 110 fathoms. The length of the other hawsers was not specifically given in the pleadings. The tow left Baltimore early Friday morning, April 5, 1907, and about 12 o'clock that night put into the Patuxent river for harbor, where it remained Saturday and Sunday, leaving there early Monday morning, the 9th, and proceeded down the bay with fairly good weather, until about the middle of the afternoon, when the indications became less satisfactory, and about 4 o'clock p. m. the wind increased considerably, the barometer falling, evidencing serious weather conditions, which continued as night came on, and during the night, to grow worse, and a rain set in. The wind at midnight was flawy, with the barometer going down rapidly, culminating in a gale and violent storm about 4 a. m. of the 9th of April. About 7 o'clock, finding it impossible to withstand the storm, the tow anchored, the barges one after another cutting loose, and anchoring or endeavoring to do so, and the tug was forced to look out for her own safety. Two of the barges remained at anchor, two were blown well from their mooring, and the Cumminsky foundered, and all on board were drowned.

The libelant's case, briefly, is that the Dixie was in fault and guilty of negligence for not going into some one of the convenient harbors along the western shore of Chesapeake Bay, in view of the then existing weather conditions, namely, Great Wiconico harbor, which was passed about 3 o'clock in the afternoon of the 8th, the Rappahannock harbor, which was passed about 9 o'clock that night, and, later, the Piankitank harbor, during the passing of all which harbors the weather conditions were serious, and it was observable that other tugs and tows had put into harbor for refuge, and, instead, in persisting in the effort to take a tow of the size in hand, in the open bay, with the knowledge on her part that she could not safely do so in anything approaching a storm; whereas, the Dixie insists that there were no weather or other conditions that made it impracticable for her to navigate as she did, that in passing the harbors specifically mentioned above there were no reasons apparent to her why she should have discontinued her journey and gone to harbor, whatever others may have thought, that her master was intelligent and competent, exercised his best judgment in determining what should be done in the then appearance of the weather conditions, that about 3 a. m. on the morning of April 9th, while in the lower Chesapeake Bay, between Wolftrap Lighthouse and New Point, in view of the falling barometer, he deemed it advisable to be near harbor, and so altered his course to make for New Point, that about 4 o'clock the wind shifted to the southwest, gradually increasing and hauling to the westward, that he found that he could not make material headway, and a violent gale followed, causing him to anchor his tow about 7 a. m., and that the disaster was brought about by the violence and suddenness of the storm, without any negligence on the part of the tug, or lack of good judgment and good seamanship on the part of her navigator.

Arthur D. Foster (John F. Lewis and Francis C. Adler, on the brief), for appellant.

J. Walter Lord (Howard M. Long, on the brief), for appellee.

Before PRITCHARD, Circuit Judge, and BRAWLEY and WAD-DILL, District Judges.

WADDILL, District Judge (after stating the facts as above). The law applicable to these cases, regarding the tug's liability to its tow ordinarily, seems not to be seriously controverted; that is, that the towing boat is not an insurer of the safety of the tow, nor has she imposed upon her the obligations resting upon a common carrier, but there is required of those charged with her management the exercise of reasonable or ordinary care, caution, and maritime skill in and about the duties imposed upon and performed by them, and if these are omitted, and disaster occurs, the towing boat becomes responsible. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Cayuga, 16 Wall. 177, 21 L. Ed. 354; Eastern Transp. Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Adelia, 154 U. S. 593, 14 Sup. Ct. 1191, 21 L. Ed. 672.

In the trial, which lasted four days before the lower court, a large number of witnesses were examined, and there was considerable conflict in the testimony as to some of the important features of the occurrence. At the conclusion of the evidence, and after arguments of counsel, the court in an oral opinion announced its conclusions and findings of fact in substance as follows:

First. That it is the custom of tugs of the same class as the Dixie to tow five and often as many as eight loaded barges from Baltimore to Norfolk.

Second. That except in favorable weather, without much adverse wind or sea, they are not able to manage such a tow.

Third. That against a strong wind, a heavy tide, or rough sea they are not able to move such a tow with any speed, and in anything like a storm, or anything approaching a gale, such a tug has as much as it can do to save itself.

Fourth. That, in order to conduct such towage with safety, the navigators of tugs should be very observant of the weather, and not run any risks that they could avoid, and should make for one of the numerous harbors in the bay, which, particularly along the western side thereof, are generally not more than from ten to fifteen miles apart, as soon as it becomes evident that stormy weather is to be expected.

Fifth. That the master of the tug, in the exercise of the degree of prudence and skill required of him, which under the circumstances here was necessary, and without which his tow could not have been safely carried, could have, if observant of the weather conditions, gone into harbor safely, before it was too late.

Sixth. That the weather indications were threatening, and the barometer falling, when the Dixie was passing the harbor of Piankitank.

Seventh. That at the time of passing Wolftrap, about 1:20 a. m., the conditions certainly were alarming. The barometer at midnight had begun to go down rapidly, the wind was flawy, there were indications of severe storm, and on the whole testimony it was reckless not to have gone into Wolftrap, if not into Piankitank harbor, and that a prudent man would have gone into the latter.

Eighth. That Wolftrap is a place where a tug can take her tow to safe anchorage.

Ninth. That the conduct of the navigator of the Dixie in failing to take timely precaution to avoid the storm, which under existing conditions he should have known was imminent, was more than an error of judgment. That it was negligence and the fault which brought about the disaster.

And thereupon rendered judgment in favor of the libelant, from which these appeals were taken.

We readily appreciate the importance of these cases as affecting the large towing business done on Chesapeake Bay, which forms a considerable part of its commerce, and the difficulty presented in having to pass upon the correctness of the judgment of the tug's navigator, in the' light of after, as distinguished from the existing, conditions and lights under which he acted. Undoubtedly much latitude must be allowed to a ship's master in the control of his vessel, and it may be said that his determination as to the proper·manœuvre to make, or the best and safest course to pursue, should be accepted, unless it seems manifest from a full consideration of all the facts and circumstances that he failed to exercise that degree of prudence, care, ·and caution that one having ordinary maritime skill and experience should and would have shown in the condition in which he was then placed. The service, to be effective, must be timely, as, here, in many cases, the time within which a given course may be determined on, or adopted, is all important. With a tow that could not be managed in bàd weather it was quite, and indeed more, necessary for the tug to guard against and look out for probable storms, and which it would seem, with the admonition of the barometer and other signs of warning familiar to those navigating the sea, ought reasonably to have been foreseen, anticipated, and provided against than it was to pursue any particular course after the same had arisen, and which, by the tardiness of her navigators, placed her in a position in which she was powerless to protect the tow committed to her care. The Syracuse, 12 Wall. 167, 172, 20 L. Ed. 382, supra; The Frank G. Fowler (D. C.) 8 Fed. 340; The Temple Emery (D. C.) 122 Fed. 180; Tucker v. Gallagher (D. C.) 122 Fed. 848.

After full consideration and investigation of the record in these cases, we are forced to the same conclusion as that reached by the learned judge of the lower court, that there was no excuse for the failure of the Dixie, in the circumstances in which she was placed, with her information as to the existing condition of the weather, and her warning or opportunities of warning of the impending storm, to delay getting to a place of safety easily within reach, until it was too late for her to protect her tow, and that her omission of duty and negligence in this respect is so manifest and flagrant as to constitute a fault sufficient within itself to account for, and which did bring about, the disaster which resulted in the drowning of the libelant's intestates.

The witnesses in these cases having been seen and heard by the judge of the lower court, his findings of fact are to be received with the strong presumption of correctness which usually in admiralty courts is given them (Jacobsen v. Lewis Klondike Exposition Co., 112 Fed. 73, 78, 50 C. C. A. 121; Memphis & Newport Packet Co. v. Hill, 122 Fed. 246, 58 C. C. A. 610; The Oak, 152 Fed. 973, 82 C. C. A. 327), and independently, our conclusions are in accordance with such findings as

affect the essential features of the cases, believing, as we do, that the preponderance of the evidence fully sustains the same.

The amounts allowed libelant of $500 for the loss of the life of her intestate John J. Egan and of $3,500 for loss of the life of her intestate John Egan are challenged as excessive. These sums seem to us entirely reasonable under the facts of these cases.

The decisions of the lower court in both cases will be affirmed at the cost of the appellants.

Affirmed.