### THE BLUE BELL.

#### (District Court, E. D. Virginia. March 20, 1911.)

1. TOWAGE (§ 15*)—LOSS OF TOW—LIABILITY.
   In a libel against a tug for loss of a crib raft made up in sections and secured by a bridle of manila rope furnished by the libelant, evidence *held* to require a finding that the casualty occurred by reason of the manner in which the raft was made up, and the insufficiency of the fastenings furnished by the libelant, and not by reason of improper navigation by the master of the tug.

   [Ed. Note.—For other cases, see Towage, Dec. Dig. § 15.*]

2. TOWAGE (§ 13*)—LOSS OF TOW—NEGLIGENCE OF TUG.
   Where a part of a raft in tow broke loose in the night on the Maryland shore owing to the fault of the libelant in the manner in which the raft was constructed and secured, and at the time of the casualty all the lights on the tow which were to have been furnished by the libelant were out, the tug, owing to the dangers incident to a search for the raft in the darkness, and the improbability of fruitful results therefrom, was not at fault for failure to stand by to try to recover the raft on the night of its loss, it being impossible for the tug to have rendered material advantage in the removal of the wreck at that time.

   [Ed. Note.—For other cases, see Towage, Dec. Dig. § 13.*]

3. TOWAGE (§ 11*)—MASTER OF TUG—LICENSE.
   Where the master of a tug was a licensed mariner on the Atlantic Coast, and, at the time of the loss of part of a raft in the Potomac river which he was towing, it appeared that he properly navigated his boat and tow, it was not material that he had no license for such river.

   [Ed. Note.—For other cases, see Towage, Dec. Dig. § 11.*]

4. TOWAGE (§ 4*)—LOSS OF TOW—LIABILITY OF TUG.
   A tug is not an insurer of the safety of the tow, nor is it bound to perform the obligations of a common carrier respecting the same, but is only required in its management to exercise reasonable or ordinary care, caution, and maritime skill.

   [Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. § 4.*]

In Admiralty. Libel by Thomas W. Smith against the steam tug Blue Bell for loss of a tow. Dismissed.

Garnett & Garnett, for libelant.

Floyd Hughes and James A. Toomey, for respondent.

WADDILL, District Judge. The libel in this case was filed to recover damages sustained by the libelant for the loss of a raft in tow of the respondent tug. The facts are briefly that on or about the 24th day of December, 1907, the owner of the Blue Bell contracted with the libelant to tow a certain raft, a portion of which was at the Upper Machodoc creek, some 38 miles above the mouth of the Potomac river, and the other part on Maddox creek, some seven miles below, the whole to be towed to Chesapeake City, at the entrance of the Chesapeake and Delaware Canal, at the price of $75 per day of 24 hours towing time, and $50 per day of 24 hours lay-over time, to be paid upon completion of the service; the tug boat to furnish sufficient towing hawser for the service, and the libelant the necessary bridles, lanterns and one anchor. Pursuant to this undertaking, the raft in ques-

tion, having been made up by the libelant, was early on the morning of the 26th of December taken up by the respondent, the first section at the mouth of Upper Machodoc creek, and the remaining section at Maddox creek, where the two were made fast to each other, and taken in tow by the respondent. The raft was not of the ordinary type—that is to say, of logs or piles made fast together, and drawn over the water, in large or small numbers, having regard to the waters over which, and the place they were to be taken to, but what was known as a "crib raft," made up in two sections, the first containing 425, and the other 333, logs, each about 40 feet in length, arranged in five layers, one upon the other, five of these groups of layers composing the first section of the crib, making it about 210 feet long, and containing, as indicated above, about 425 logs. The second section was similarly made up, containing 333 logs, and was also about 210 feet long. These logs and layers were made fast by means of stringers,.iron cables, bolts and wire, in such manner as the libelant insists was sufficient for the safety of the raft over the waters it had to traverse. The tow proceeded down the river on a hawser of 200 fathoms. The weather was good, and the journey uneventful until late in the afternoon, when in the neighborhood of St. Mary's river, some six miles above Point Lookout, the representative of the libelant, who was then on the tug, according to his statement, suggested the propriety of going into that river for harbor, on account of the then condition of the weather, the wind at the time blowing, as it is claimed, 10 or 15 miles an hour from the southwest. This conversation the respondent denies, and says on the contrary that libelant's representative commented on the favorable condition of the weather half an hour before the breaking loose of the raft. That about the time it broke loose, it was discovered that the raft's lights were out; the wind was blowing 12 to 15 miles from the southwest; and that then, about 9 o'clock p. m., when within 1½ to 2 miles of Point Lookout, the raft did break loose; that there were no weather conditions justifying the abandonment of the journey and going into harbor at St. Mary's river, and had there been such, with the then condition of the wind from the southwest, the safer course would have been to go around Point Lookout into the bay, and make harbor on the lee of the land around Point Lookout.

The errors in navigation relied on specifically by the libelant are that the master of the tug was without license to navigate the waters of the Potomac river; that he erred in failing to go into St. Mary's for harbor; and that he neglected to stand by sufficiently long to search for the raft the night of its loss, and to properly assist in saving it when it was discovered two days later. The respondent, on the other hand, insists that the raft was insecurely made up for such a journey; that it would have gone to pieces upon striking rough water; that the tow log was inefficient, and insufficiently secured; that the bridle of manila rope furnished the tow was not such as the service demanded; that the raft was without proper anchor, and the lights defectively constructed; and that there was nothing in the condition of the weather to justify going into harbor; and that the loss resulted solely from the inherent weakness in the towing apparatus provided by the libelant.

[1] The solution of the case depends almost entirely upon the correct determination of questions of fact, and the conclusion of the court is that there would have been no accident had there been sufficient towing attachment to the raft, and that the loss arose because of the lack thereof. It was an unusual structure, made up as above indicated. There were a number of logs fastened together, piled one on top of the other, so that the raft sank down in the water some five or six feet, showing not more than 10 or 12 inches freeboard. It was 400 feet long, necessarily of immense weight, and required the strongest and most powerful appliances for the tow; and, when put to the test, the strain was too great, the tow log pulled loose from the raft, setting the same adrift. Whether the manila rope broke or not, is not known, but the probabilities are that it did not, as the tow log was pulled off the raft, and the entire bridle, manila rope, and tow log were lost. The hawser was hauled aboard the tug in the presence of the libelant's representative and showed that it did not break, and, when the raft was recovered, it was apparent that the tow log had become detached. This was an appliance furnished by the libelant which gave way, and brought about the disaster.

The view of the testimony taken by the court is that there was no reason why the master of the Blue Bell should not have proceeded with the tow; that is, that the weather conditions were not such as required him to go into St. Mary's river. As the raft's appliances gave way so quickly after passing the river, the strong probabilities are that the accident would have happened had the Blue Bell, in the face of a southwest wind, attempted to change the course of the tow, so as to make in to that river, and the effort so to do would have certainly caused considerable strain upon the appliances of the raft, doubtless more so than to have gone straight ahead.

The libelant, in the construction of this raft, undoubtedly exercised great care in putting it together, and endeavored as far as was possible, with the material used, to make it safe, as he also especially did in the construction of the tow log across the forward end of the first section; but the tow log was not so constructed in the estimation of many experts who testified before the court, as to make it safe for the towing of a raft of this character, length, size and weight, and when put to the test, it pulled away, thereby demonstrating its insufficiency.

[2] Moreover, the Blue Bell should not be held liable for failure to stand by for the purpose of trying to recover the raft, on the night of the loss, considering the darkness of the night, the fact that the lights to be supplied by the libelant on the raft were confessedly out, the dangers to the tug incident to such a search, and the improbability of fruitful results therefrom; nor should she be held liable under the circumstances of this case, for the failure to remain longer than was done, after the raft was found, virtually upon the Maryland shore, two days after the occurrence. It was impossible for the tug to have rendered material advantage in the removal of the wreck at that time, nor, indeed, could the same have been made until new towing appliances were put upon it. As soon as the raft was ready, and the weather made it practicable to move it, the respondent did all that reasonably could be required of it.

[3] The failure of the master to have a license for the Potomac river likewise did not enter into this occurrence. He was evidently a mariner of exceptional experience, his licenses showing that he was authorized to act as "Master on Atlantic Coast. First class pilot bays and harbors from Portland, Me., to Gay Head, Mass.; from Point Judith, including Narragansett Bay and Providence river; Long Island and Block Island Sounds, via The Race to Faulkner's Island, Conn.; New York Bay and harbor; Delaware River and Bay; Capes of Virginia to Norfolk, Va.; and Chesapeake Bay, including Hampton Roads and Patapsco river, between Baltimore and Cape Henry;" and while technically his license seems not to have included in terms the Potomac river, evidently the waters of Delaware river and Bay, Capes of Virginia to Norfolk, Va., and Chesapeake Bay, including Hampton Roads and Patapsco river, between Baltimore and Cape Henry, indicated that he was familiar with the mouth of the Potomac river. At all events, the failure of the license to include that river, seems not to have entered into this occurrence, as it is clear that he properly navigated his boat and tow on the occasion in question.

[4] The duty of the tug to its tow is not that of an insurer of its safety, nor has it imposed upon it the obligation of a common carrier respecting the same; but there is required of those charged with the tug's management the exercise of reasonable or ordinary care, caution, and maritime skill in and about the duties imposed upon and performed by them; and if these are omitted, and disaster occurs, the towboat becomes responsible. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Cayuga, 16 Wall. 177, 21 L. Ed. 354; Eastern Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Adelia, 154 U. S. 593, 14 Sup. Ct. 1191, 21 L. Ed. 672; Southern Towing Co. v. Sarah J. Egan, Administratrix, etc. (Circuit Court of Appeals, Fourth Circuit, November term, 1910) 184 Fed. 275. This obligation it has fully met in this case.

The accident having occurred by reason of the libelant's omission of duty, without fault on the part of the respondent, it follows that no damages can be allowed, and that the libel should be dismissed at libelant's costs, and it will be accordingly so decreed.