THE E. V. McCAULLEY.

(District Court, E. D. Virginia. June 6, 1911.)

1. TOWAGE (§ 1*)—TUG'S LIABILITY FOR LOSS OF TOW—CARE REQUIRED.

A tug is not an insurer of the safety of the tow, nor subject to the obligations of a common carrier, but is only required to use ordinary care and maritime skill in performing the contract of towage.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 4; Dec. Dig. § 4.*]

2. TOWAGE (§ 11*)—PORT OF SAFETY—DISCRETION OF MASTER.

Where, on the day after departure of a tug and tow from Norfolk for Boston, the weather conditions became such that it was deemed advisable for safety to seek shelter from an impending storm, whether those in charge should have returned to the Virginia Capes some 70 miles away

or sought shelter under the lee of Assateague Shoal, which would have necessitated a comparatively short run, feasible, but slightly more dangerous, was a matter for the judgment of the master, whose determination will be held conclusive, in the absence of manifest error or negligence.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

3. Towage (§ 11*)—Loss of Tow—Negligent Navigation.

Where the master of a tug in charge of a tow, being required to seek shelter from a storm, unnecessarily and in broad daylight ran the tow on the Blackfish Bank, a charted shoal of large proportions, well known and recognized by mariners, the loss of the tow and cargo resulted from negligent navigation for which the tug was liable.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

In Admiralty. Libel by Staples Coal Company against the steam tug E. V. McCaulley. Decree for libelant.

Harrington, Bigham & Englar (Howard S. Harrington and T. Catesby Jones, advocates), for libelant.

Floyd Hughes, for respondent.

WADDILL, District Judge. On the 28th of November, 1909, the tug E. V. McCaulley, owned by the respondent, the Lambert's Point Towboat Company, took in tow at the port of Norfolk the barge Gatherer, also owned by said towboat company, with a cargo of 2,340 tons of soft coal, en route from Norfolk to Boston, Mass. The weather at the time was favorable for the voyage, and no difficulty was encountered until on Monday, the 29th of November, about 11:45 a. m., when the tug had gotten well out at sea, and some 12 miles to the northward and eastward of the Winterquarter Lightship, the weather conditions became such that it was deemed advisable for the safety of the tug and tow to discountinue the journey and seek shelter from the impending storm. The wind was north northeast, blowing 45 or 50 miles an hour. Some difficulty was encountered in putting about, but a second effort proved successful, and the barge and tow proceeded with a view of making the nearest available harbor, navigating on a course, as insisted by the libelant, of west by south half south, passing Winterquarter Lightship about 2 p. m., a mile and a half to the westward of the light—that is, between the shore and the light—and when three or four miles below the lightship, after having observed the Assateague Lighthouse, the course was changed to southwest by south, and upon running on that course 20 or 30 minutes, at 4:10 p. m. her course was again changed to west one quarter north, and, after continuing on that course 30 or 40 minutes, the barge stranded on the northern edge of Blackfish Shoal, causing a total loss of the barge and cargo.

The libel is filed to recover the value of the cargo lost; and libelant insists that the McCaulley should be held liable for the failure to so navigate as to avoid running upon a well-recognized charted shoal; that the navigator of the tug was incompetent and negligent in failing to keep on the proper course, and that the tug was not of sufficient power to safely tow the barge on the voyage in question. Whereas,

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

respondent insists that the tug was properly manned, and in all respects seaworthy and sufficient for the service in hand, and that the disaster occurred in an effort to make harbor, or secure anchorage under the shelter of Assateague Shoal, and was in no respect due to negligence, omission, or want of skill on the part of those charged with the navigation of the tug, but solely because of the severity of the storm.

[1] Under the law, the towboat is not an insurer of the safety of the tow, nor has she imposed upon her the obligation resting upon common carriers; but there is required of those charged with her management, the exercise of reasonable or ordinary care and caution and maritime skill in and about the duties imposed upon, and to be performed by her. If these are omitted and disaster occurs, she becomes responsible. The Syracuse, 12 Wall. 167, 20 L. Ed. 382; The Cayuga, 16 Wall. 177, 21 L. Ed. 354; Eastern Transp. Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Adelia, 154 U. S. 593, 14 Sup. Ct. 1191, 21 L. Ed. 672; Southern Towing Co. v. Egan, Adm'x (November 10, 1910, C. C. A. Fourth Circuit) 184 Fed. 275; Thomas W. Smith v. Blue Bell, District Court, E. D. Virginia, March, 1911, 189 Fed. 824.

This case turns almost entirely upon a question of fact, as to whether or not, under the circumstances, the McCaulley should have abandoned her voyage, and attempted to make harbor; whether the particular harbor or place of refuge should have been sought, or some other; and whether in attempting to make anchorage under the lee of Assateague Shoal, reasonable care and caution and maritime skill was exercised on the part of her navigator, or that there was such lack thereof as constituted within itself fault for which the tug should be held responsible. In passing upon the conduct of those in control of the McCaulley's navigation, on the occasion in question, the court cannot, and should not, lose sight of the fact that the same is being viewed after the event, as distinguished from the exigencies of the position in which they were placed, and hence as to all matters involving the exercise of discretion, such as whether there should have been a temporary abandonment of the voyage, the course best to have been pursued, and what particular harbor should have been sought, all largely matters of discretion, error should not be imputed to them except in case of gross and manifest error or negligence.

[2] The testimony is clear to the court that the return trip with a north-northeast wind to the Virginia Capes, some 70 miles away, could have been readily and safely made, the tug and tow running before the wind; but whether this should have been done, or refuge sought under the lee of Assateague Shoal, was a matter as to which the judgment of the master of the McCaulley should control, and he was entirely justified in seeking protection from the storm under Assateague Shoal, which necessitated a comparatively short run. It is true that it was a more dangerous course to pursue than returning to the Capes, but one that was entirely practicable, and there was no reason to believe could not have been safely made under the then conditions of the weather.

[3] The real question to be determined is whether the McCaulley should be held responsible for her navigation in the effort to make this harbor, or place of refuge, and as a consequence, in grounding the barge upon the shoal of Blackfish Bank, instead of taking the same under the lee of the land safely to anchorage. The evidence is virtually undisputed that there was no difficulty in making this anchorage in the daytime, with clear weather as existed on this occasion, and the wind north-northeast, blowing 45 or 50 miles an hour. All that was necessary was for the tug and tow to have kept sufficiently far to the southward and eastward to go round or under the Blackfish Shoal to the Assateague anchorage, instead of crossing the shoal, as was done. The wind was blowing offshore; the light of Assateague was plainly in view and observed, as was also the existence of the shoal waters of Blackfish Bank, and either to have run on said bank, or the shoal thereof, or into such close proximity as not to have been able to avoid grounding thereon, was gross and palpable error, constituting within itself more than mere mistake in judgment, namely, a positive fault, which sufficiently accounts for the disaster that took place. Blackfish Bank is a charted shoal, of no mean proportions, well known and recognized by mariners, and to have run upon and over it in broad daylight, and in not especially unfavorable weather, was inexcusable. The course pursued by the McCaulley's navigator on the occasion in question is doubtless attributable to the removal of the Winterquarter Lightship from the place where it had long been stationed, to a distance of some 7¾ miles to the northward and eastward, of which fact the master of the McCaulley had only a general idea—that is, he knew that the lightship had been moved to some extent—but he thought something less than half the distance it had been actually moved, which accounts for his making the departure on his course as early as he did, to go into Assateague. Had he been 3½ to 4 miles further on his course, it is most probable he would not have grounded, but safely passed under the lee of the shoal. Be this as it may, however, it will not serve to excuse the tug from liability for grounding the tow upon a well defined, charted shoal, especially when the shore marks, the lighthouse on the shore, and the sea on the shoal itself, one and all gave admonition of the fact that the McCaulley was plainly navigating in a place of manifest danger, instead of one of safety.

The suggestion that the McCaulley was not of sufficient size and power to have undertaken the towage service in which she was employed, is, in the opinion of the court, without merit. She had frequently rendered similar service; was built and equipped for the ocean trade, and there was no reason why she should not have safely executed her contract, but for the fault in her navigation aforesaid.

A decree may be entered for the libelant for the value of the cargo lost, with costs.