ATKINSON v. SCULLY.

(District Court, S. D. New York. April 30, 1917.)

1. TOWAGE ⬤⟿19—LOSS OF TOW—LIABILITY FOR DEATH OF MASTER.

A tug with two coal laden barges in tow tandem on hawsers of about 225 fathoms each was on a voyage from Hampton Roads to Providence, R. I., when while passing to the eastward of Block Island in the early morning it was discovered that the rear barge had gone adrift. The wind was blowing a gale from the west. The forward barge, which was leaking at the commencement of the voyage, had been pumping constantly since the commencement of the heavy weather the day before. *Held*, that the master was not in fault for not leaving the leaking barge, which would have been thereby greatly endangered, to search for the one adrift, but that he was in fault for starting on the voyage with the barge in a leaky condition of which he had knowledge, and that the owner of the tug was liable for death of the master of the other barge, which was lost.

2. TOWAGE ⬤⟿11(10)—LIABILITY OF TUG—BREAKING ADRIFT OF TOW.

A tug is held to a high degree of diligence in endeavoring to save a tow which has gone adrift.

3. TOWAGE ⬤⟿11(5)—LIABILITY OF TUG—TAKING OUT LEAKY TOW.

A tug which takes out a leaky barge must be held liable for all the proximate results of such conduct.

4. DEATH ⬤⟿95(1)—ACTION FOR WRONGFUL DEATH—DAMAGES.

Damages recoverable by an administrator for the death of his intestate who was lost at sea while acting master of a barge considered under the New Jersey statute (2 Comp. St. 1910, p. 1908, § 8, as amended by Act April 9, 1913 [P. L. p. 586]), which authorizes recovery for the pecuniary injury resulting to the wife or next of kin, who in the instant case were nephews and nieces of deceased.

In Admiralty. Suit by Gustav E. Atkinson, as administrator of the estate of Alfred Siljander, deceased, against Thomas J. Scully. Decree for libelant.

Warner C. Pyne and O. D. Duncan, both of New York City, for libelant.

Frank V. Barns, of New York City, for respondent.

MAYER, District Judge. [1] The action is to recover damages for the death of Alfred Siljander alleged to have been caused by the negligence of respondent and his servants and agents, including the master and crew of the tug John Scully. In December, 1913, respondent was the owner of the steam tug John Scully and of the barges Henry Failing and Francis Hampshire. On the voyage in question Siljander was acting as master of the Hampshire, having been hired to make the voyage by the barge's regular master who was ill. On the morning of December 5, 1913, the tug John Scully sailed from Hampton Roads. She had in tow the barges Failing and Hampshire laden with 2,927 tons and 1,600 tons of coal, respectively. Both barges were bound for Providence, R. I. At the time of sailing from Hampton Roads the weather was fair and a moderate wind of about eight miles an hour was blowing from the west. Proceeding to sea the barges were towed tandem fashion on long hawsers, the Hampshire being the tail barge.

The length of the hawser between the tug and the Failing was about 225 fathoms, and the hawser between the Failing and the Hampshire was about the same length. The tug with her tow followed the usual course up the coast. The fair weather of the 5th continued on the 6th. On the 7th it became cloudy, and some rain was encountered. At about 3 a. m., December 8, 1913, Montauk Point was passed outside of the gas buoy. The wind was then from the west, and it was blowing a gale. At somewhere around 5:30 a. m., as near as the witnesses could tell, while the tug was making a turn around the southeast end of Block Island, which was then about 1¾ to 2 miles distant, the hawser to the barge Hampshire parted, and the barge went adrift. Those on board the tug discovered that the barge was adrift while they were making their change of course, but they did not see her go adrift and were unaware of just when she did break loose. There were no witnesses surviving from the Hampshire, and no one was called from the Failing.

Capt. Willin of the Scully testified that when he discovered the Hampshire was adrift he slowed the tug down for about 15 minutes. First Mate Dodd of the tug, who was on watch in the pilot house from 12 midnight to 6 a. m., stated that he was sure the tug had not slowed down while he was on watch. The first assistant engineer, Peterson swore that the tug slowed down for about 15 minutes while Beebe, the chief, stated that they were slowed down "probably three-quarters of an hour, maybe not so long." The engineer's log, was not produced because it had been lost in the bilges.

I think it may fairly be concluded that the tug was slowed down about 15 minutes because Capt. Willin and Peterson seem to have been best informed on that point. After those on the tug realized that the Hampshire had broken adrift Capt. Willin and the mate consulted, and the captain concluded to go ahead because he was convinced that any other procedure would result in the loss of the Failing with all aboard.

The views and judgment of Capt. Willin from the time the craft came by Montauk Point until he decided to continue to Newport after the Hampshire had broken adrift are concisely summed up in the following extract from his testimony:

"Q. Coming by Montauk, was the tow coming all right? A. It was coming all right. Q. Did you consider going to the westward of Block Island and cutting through? A. Yes; I did. Q. Why did you not go through? A. Because I went in there twice in my life under the same conditions, and I had to keep off and go to the eastward. It threw the barges into the trough of the sea. Q. What was your reason for not going in? A. The barges make better weather running before the sea. Q. To the best of your knowledge, how was the tide running? A. I think the tide was running westward. Q. With the tide running west, would that increase the peril? A. It would make it a worse sea. Q. It would make what we call a weather sea? A. Yes. Q. You received no signal whatever from the Hampshire previous to her breaking adrift? A. None whatever. Q. Did you see the Hampshire after she broke adrift? A. No, sir. I saw the outlines of her before I saw we started ahead faster, and she seemed to be coming all right the last time I looked back. That was just before we found we were going ahead faster. Q. After you had got the barges by Southeast Head Light bearing northwest, did you consider going under the lee of Block Island, to see if you could find the barge

broken adrift? A. I said if we did, the Failing would go down and lose all hands. The mate and I talked this matter over. Q. Have you ever anchored a barge under Block Island under these conditions? * * * Q. After coming on your regular course did you receive any signal from the Failing? A. I received no signals from her. Q. Had you any idea as to the tightness of her hull? A. I knew she was leaking because they had been pumping all day. Q. Did you notice the conditions on the Hampshire? A. Everything seemed to be O. K. on her. Q. Are the barges equipped with sail? A. Yes. Q. What is it used for? A. Used in case of breaking adrift, to help them along. Q. Have they got sail enough to maneuver the ship? A. They have enough to move the ship 4 or 5 miles an hour in a breeze of that kind."

Willin was a man of great experience in this service on the coast, and in fact was the "oldest in the business," having had an experience of 30 to 32 years. The tug was properly equipped and manned, and the Hampshire was in excellent condition. The Failing, however, was leaking. It seems that she had had her yearly overhauling about five months before, and no complaint had been made to respondent's superintendent of repairs as to her leaking, but Captain Willin knew that she was leaking when she left Hampton Roads. After leaving Hampton Roads, Capt. Willin did not see any pumping on the Failing until December 7th, and thereafter the pumping was constant. Following are the relevant extracts from Willin's testimony in this regard:

"Q. The only way you knew the Failing was leaking was by seeing them pumping? A. They were constantly pumping. Q. Where was the pump located? A. Forward. Q. What kind of a pump was it? A. Steam pump. Q. You saw the steam exhaust? A. Yes. Q. Was there steam heat on the barges? A. I do not know, I know they had a steam pump, but I don't think they had steam heat. Q. Captain, was the Hampshire leaking also? A. I saw no signs of it. Q. You did receive any signals from either barge? A. No, sir. Q. No complaint from the Failing about leaking? A. Yes; when we started they complained about leaking. Q. At the time you left Hampton Roads? A. Yes, they said she was leaking but no more than usual. Q. They did not say it was increasing? A. No. Q. Then at the time you left Hampton Roads, you knew the barge was leaking? A. Yes. Q. Did you talk with the captain? A. No, sir. Q. Did they pump all the way to Newport? A. No, after we left Hampton Roads, we did not see any more pumping until the 7th and never saw it stop again until we got to Newport. Q. You received no word of the Hampshire leaking? A. No, there was no complaint from the Hampshire. * * * Q. In towing barges, do you find it is uncommon for them to leak? A. I think it is an ordinary thing for them to leak some. Q. Do you find any difference between built barges and ship barges? A. Yes. Q. Do you find that the ship barges leak more than the others? A. Yes; I think the older class of barges leaks more."

It is contended that the leaking was only to such extent as is usual for this type of converted ship barge, and that there was not any increase of leaking until the heavy weather of December 7th was encountered; but the testimony certainly leads to the conclusion that the Failing must have been far from tight, for she leaked very badly after the rough weather had set in. Under such circumstances, I am satisfied that it would have been folly for Capt. Willin to take the chance of leaving the Failing to her fate in the hope of finding the Hampshire and saving her. The situation was one where an experienced master was called upon to exercise judgment in a serious emergency. With a leaky barge in tow, his duty was to proceed to a port of safety as fast as he could and avert the possibility of further disaster. This he

246 F.—30

did by going to Newport and returning to look for the Hampshire as fast as could be reasonably expected.

The sole question is whether the master should have started on his journey with the knowledge that the Failing was leaking; for the testimony does not disclose any facts which show that Capt. Willin was in any manner to blame for the breaking adrift of the Hampshire. I think the trouble in this case is that some men of the sea become indifferent to danger. They do something so many times without disaster that they no longer appreciate its danger, just as the seasoned New Yorker in crossing a busy thoroughfare will take a chance which would horrify a country visitor. And so in this case the captain evidently was indifferent to possible danger when he started from Hampton Roads with a leaky barge.

If the Failing had not been leaking, I am satisfied that with a westerly wind there was a lee to the eastward of Block Island in which the Failing could have been safely anchored. This was pointed out by Capt. Stone of the Navy, who impressed me most favorably, and he marked on the chart where he thought the Failing could have been anchored. Coxe, a tugboat captain, entertained the same view and expressed his opinion to the effect that the Failing could have been safely anchored in about two hours; that is to say, about 7:30 to 8 a. m., whereas the Scully did not get back to Block Island from Newport until about 11:30 a. m., a difference of 3½ to 4 hours. Who shall say that, if the Scully had been free to search for the Hampshire, she would not have found her in those 3 or 4 hours?

[2] It must be remembered that the courts have held tugs to a high degree of diligence in endeavoring to save a tow which has gone adrift. Usually, the tow is helpless, and to abandon it is to commit it to almost certain loss or injury where a gale is on and the sea is rough. Williams v. Alaska Commercial Co., 2 Alaska, 43, affirmed 128 Fed. 362, 63 C. C. A. 92; Appeal of Cahill, 124 Fed. 63, 59 C. C. A. 519; In re Moran (D. C.) 120 Fed. 556.

It follows from the foregoing that the Scully disabled herself from doing that which diligence and vigilance required, because she had taken a leaky barge in tow with full knowledge of that fact.

[3] It is no excuse that the weather at the beginning of the journey and for some time thereafter was good. No one can surely predict what the weather at sea may be three days hence; and prudence requires foresight and safeguarding against bad weather and rough seas. If a tug takes out a leaky barge, she must be held to all the proximate results of such conduct, and that is this case.

For the reasons stated, I therefore find respondent liable.

The next question is that of damages.

[4] The measure of damages in the case is governed by the New Jersey statute (2 Comp. St. 1910, p. 1908, § 8, as amended by Act April 9, 1913 [P. L. p. 586]) which provides inter alia:

"*Death by Wrongful Act; Persons Entitled to Bring an Action; Distribution of Amount Recovered:*

"Sec. 2. Every such action shall be brought by and in the names of the personal representatives of such deceased person, and the amount recovered in every such action shall be for the exclusive benefit of the widow, surviving husband, and next of kin * * * their proportions provided by law in rela-

tion to the distribution of personal property left by persons dying intestate; and in every such action, the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death to the wife, surviving husband, and next of kin of such deceased person."

The next of kin in this case are nephews and nieces.

Siljander was born in Finland in 1861, so that in 1913 he was 52 years of age. He was never married. Just when he came to this country is not in evidence. In 1877 he lived in Chicago, having a room with Gustav Atkinson, the administrator of the estate of Siljander. He was employed for several years on vessels on the Great Lakes. In 1905 he was employed on coastwise coal barges, and apparently continued to work on them until 1913. While Atkinson testified that Siljander had been master of coal barges, there is no definite testimony by which it may be determined what his earnings averaged. As master of the Hampshire he took the place of the regular captain, whose wages amounted to about $58 per month. Whatever the amount of his earnings may have been, he did not make any substantial savings, and it is fair to assume that, having reached the age of 52, he would not have changed his habits as regards savings, and never would have accumulated an estate. His nieces and nephews were Fena Carlson of Obo, Finland, Anna (Siljander) Brown, Albert, Victor, William and Arthur Siljander of Chicago, Ill.

As to the niece, Fena Carlson, there is no evidence as to her age, or any fact concerning her, except that she is a daughter of a deceased sister of Siljander. The other nieces and nephews are all children of Albert Siljander, deceased, who was a brother of Alfred Siljander. They all live in the city of Chicago. The oldest one, Anna Brown, is 30 years of age. She is married, and her husband conducts a private school in Chicago. Albert Siljander is 24 years of age, Victor Siljander in 23 years of age. Both of these men are draftsmen. William Siljander was 19 years of age at the time of the taking of the depositions in October, 1915. He had just been graduated from high school, and was about to begin work. Arthur Siljander, in October, 1915, was 16 years of age, and was attending high school. There is no evidence that any one of these persons ever received any pecuniary assistance from Alfred Siljander. They were all brought up and supported by their own parents, and there is no evidence from which an inference can be drawn that they could reasonably expect to ever receive any pecuniary advantage from Alfred Siljander. From the evidence it is quite apparent that Siljander saw little, if anything, of his Chicago relatives and they seem to have had no interest in him or he in them. He was of the type who lived on the water, concerned only with his own life and indifferent to relatives who, from the standpoint of a man like Siljander, presumably were well to do. From the testimony of Atkinson, the administrator, it may, however, be fairly concluded that he sent his sister in Finland, the mother of Fena Carlson, a little money occasionally. He testified to two such incidents in 1889.

The testimony is very meager, due, no doubt, to difficulty of communication during war times, and possibly the expense of issuing a commission.

I think it is fair to assume that Siljander by occasional remittances, would have sent his niece some small amount every year, although, frankly, this is somewhat in the nature of a surmise rather than a clear conclusion from testimony. However, as Judge Thomas said in The O. L. Hallenbeck (D. C.) 119 Fed. 468:

"This evidence does not furnish a very substantial basis for pecuniary damages, but, employing the latitude that is permitted, it is considered that there was some financial loss."

To award only nominal damages or to refuse to award any would not, in my opinion, be in accordance with principles of justice. The administrator was bound to produce all the witnesses he could, including experts, and as he has succeeded in proving the negligence of respondent, I think, under the peculiar circumstances of the case, that the award should be made having in mind what will be left after actual disbursements.

$500 will produce, at 5 per cent., $25 per annum, and we cannot speculate that Siljander would have sent his niece in Finland more than $25 each year, and $500 was the amount awarded in the Hallenbeck Case, supra, where the next of kin were sisters who were self-supporting. Of course, there are many cases where sisters and nieces are dependent on brothers or uncles and have been supported by them and their loss is fully as serious as the loss of a husband. In such cases, substantial damages may well be recovered. But, in the case at bar, there is no such situation.

Taking everything in consideration, libelant may have a decree for an amount equal to $500, plus any actual disbursements not taxable, such as experts' fees. If there is any difficulty as to these details, they will be adjusted on the settlement of the decree. The decree, of course, is with costs.

Submit decree on three days' notice.

### Addendum.

Of course, the award must go to the administrator, and it would appear under the New Jersey statute that it must be divided in the proportions provided by the New Jersey law in relation to the distribution of personal property left by persons dying intestate. I do not, however, pass upon this point, as that will be disposed of in the court where the administrator will account. I have endeavored, however, to make clear that there was no pecuniary injury to the Chicago relatives, but only to the niece in Finland.

The federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65. [Comp. St. 1916, §§ 8657–8665]) best expresses the proper and logical disposition of a recovery for negligence. Under that act, where next of kin are concerned, then the recovery is for the benefit of the next of kin "dependent upon such employé."