## THE RICHARD F. YOUNG.

### (District Court, E. D. Virginia.  June 16, 1917.)

1. TOWAGE ⬠11(1)—LOSS OF TOW—LIABILITY OF TUG.
    A tug proceeding to sea from Norfolk in February with three heavily laden coal barges in tow *held* in fault for the loss of two of the barges, on the ground that: (1) She was not built nor equipped for ocean service of the kind undertaken; (2) she commenced the voyage in threatening weather with knowledge of storm warnings, and passed out to sea through the Capes when weather conditions were such that prudent navigation required her to seek shelter; (3) her officers and crew did not have the requisite knowledge, experience, and ability to handle such a tow in a safe manner; (4) those in charge did not exercise the degree of prudence and caution required by good seamanship after leaving the Capes, in that they took a course outside of that usually taken by coastwise vessels, when they should have kept as much as possible under the lee of the land in view of the northwest gale; and (5) at the time of the breaking of one of the steering cables from inherent weakness, which was the immediate cause of the disaster, they failed to exercise proper care for protection of the barges by anchoring the same and standing by, and that such faults were concurring causes of the loss and rendered the tug liable therefor.

2. TOWAGE ⬠11(1)—LOSS OF TOW—DEFENSE OF INEVITABLE ACCIDENT.
    To enable a towing tug to successfully interpose the defense of inevitable accident in a suit for loss of its tow, it must itself have been free from fault.

3. SHIPPING ⬠209(2)—LIMITATION OF LIABILITY—TUG OWNER—LOSS OF TOW.
    The owner of a tug *held*, under all of the facts, entitled to a limitation of liability as against claims for the loss of barges in its tow and their cargoes.

4. SALVAGE ⬠34—COMPENSATION—SALVING OF BARGE ABANDONED BY TUG.
    A tug worth $70,000 *held* entitled to a salvage award of $1,450 for towing into port a coal-laden barge worth with its cargo $55,000, found anchored at sea after having been cast off by its towing tug, and in a perilous position; the services requiring 16 or 17 hours.

In Admiralty. In the matter of the petition of Henry Crew, owner of the steam tug Richard F. Young, for limitation of liability. Also, libel by the owner of the tug John F. Lewis against barge No. 7 for salvage services. Decree in favor of damage claimants, but granting limitation of liability. Also, decree in favor of the Lewis.

Foley & Martin, of New York City, and Hughes & Vandeventer, of Norfolk, Va., for petitioner Henry Crew.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for cargo owners and barge No. 7.

Lewis, Adler & Laws, of Philadelphia, Pa., and John W. Oast, Jr., of Norfolk, Va., for tug John F. Lewis.

Duncan & Mount, of New York City, for barge Shamokin.

Edward R. Baird, Jr., of Norfolk, Va., for barge J. Carlton Hudson.

WADDILL, District Judge. On the morning of the 18th of February, 1916, the tug Richard F. Young took in tow at Norfolk, Va., bound for Providence, R. I., the barges J. Carlton Hudson, the

Shamokin, and the Rockland, and Rockport Lime Company's barge No. 7, each laden with coal; the tow being made up in the order named. The tug and tow proceeded on their course, and encountered heavy weather early on the night of the 18th, which grew worse as the night advanced, and on the early morning of the 19th, when some distance off Hog Island, the weather increased in severity so much that the Young, in endeavoring to protect its tow, broke its port steering cable; whereupon, she signaled to the barges to anchor, which the two last named did, and, the Hudson failing to anchor, the tug endeavored to put into Hog Island with her, but, when some distance away, the barge while in a sinking condition was cut loose and suddenly foundered. The tug then returned to Newport News, and a revenue cutter towed the Shamokin into Lynnhaven Inlet, where she subsequently sank and proved a total loss, and barge No. 7 was towed into Newport News by the tug John F. Lewis.

Sundry libels were thereupon filed against the Young by the owners of the barges, the cargo owners, and for persons who had lost their lives by the sinking of the barge Hudson; and this proceeding, seeking to limit the liability of the tug, was duly filed.

The Young alleges that the accident happened without fault, neglect, or want of care on her part; that the loss, damage, and injury was occasioned without the privity or knowledge of the libelant-petitioner; and that claims filed, or to be filed, against the Young, growing out of the accident, exceed in amount her value and that of her pending freight money, and the value of petitioner's interest therein at the time of and immediately after the accident; and that the tug and freight money was not of greater value than $37,000.

Owners of the respective barges, of the cargoes, and for death losses, filed their claims and answers to the petition for limitation of liability, denying generally the averments of the said petition, and aver that the barges were seaworthy, well found and equipped, and were all without fault or negligence or want of care on their part, and that the loss in question was solely due to the fault and negligence of the tug Young, and those in charge of her navigation, and particularly that the Young was not in charge of a competent master, and was not properly officered, manned, tackled, appareled, and equipped; that she left Norfolk in threatening weather, and in disregard of storm signals; that she passed Old Point in threatening weather, and in disregard of the storm signals there; that she passed the Capes during a storm, and disregarded storm signals there, all of which good seamanship would have warned her navigators not to do; that she navigated on an improper and unsafe course, going outside of the usual track of coastwise vessels, and failed to keep under the lee of the land; that she did not proceed to a safe anchorage with the barges before the storm became too heavy; that she did not keep her tow under proper control; that her steering cable was not of sufficient power or strength; that her machinery was not in proper order and good condition; that she was unseaworthy; that she towed the barges in an improper, negligent, and careless manner; that she improperly abandoned her tow, and made no effort or attempt to safeguard the

barges and crews of the barges either before or after abandoning them; and that she took a towage service which the tug was incapable of performing; that, upon the Young's steering cable parting, she hauled around offshore, and the barges fell into the trough of the sea, endangering their colliding one with the other; that, while in this condition, she signaled for the hawsers to the barges to be cast off, and caused the Shamokin and barge No. 7 to be set adrift, and abandoned them without offering or trying to assist them in their extremity; that the tug and the Hudson in a little while disappeared, going in the direction of the Capes, and the Nepos, a Norwegian steamship, took off the crew of the Shamokin, and safely landed them in Norfolk, and the barge was picked up by a revenue cutter and taken to Lynn-haven Inlet, where she sank, and was a total loss; that, after barge No. 7 was abandoned, she anchored near where she was cast off, and there remained until the morning of February 20th, when she set her sail, and sailed in towards the land, and again anchored, and in the afternoon of that day she was taken by the tug John F. Lewis and towed to Norfolk; and while proceeding towards the Capes, in tow of the Young, the Hudson foundered and became a total loss, and all of her crew were drowned.

[1] An unusual amount of evidence was taken, both by deposition and orally before the court, and there is much conflict as to many material matters bearing upon the merits of the controversy. The court's conclusion, having regard to the measure of duty imposed upon the tug, namely, to exercise reasonable skill and care in everything relating to the work until it was accomplished (The Margaret, 94 U. S. 494, 24 L. Ed. 146; The Alabama [D. C.] 114 Fed. 214), and to the fact that the burden of proof is upon the tow to establish fault on the part of the tug, is that the fault of the latter has been established, as shown by the following findings, viz.:

First. That the tug was neither built nor equipped nor intended for ocean service of the character in which she was employed at the time of the accident. That she was built as a pleasure or passenger boat, for harbor service, and towing in inland waters only. That the service in which she was engaged at the time was that of towing three ocean-going barges, heavily laden with coal, en route from Norfolk to Providence. That the tug was equipped with a bronze tiller or steering cable, instead of a steel one, which while useful in the harbor and inland waters, by reason of its durability, pliableness, and freedom from corrosion in salt water, was, by reason of its lack of strength, it being but one-half as strong as a steel cable, unsuited for a seagoing service of the kind in which it was being used, in a storm. That the bronze cable parted upon encountering a severe strain of considerable duration, such as might have been expected on a voyage of the character undertaken, which culminated in the breaking up of the tow, and in large measure caused the disaster complained of by the owners of the barges, and cargoes, and those affected thereby.

Second. That the tug took its tow out in threatening weather conditions, with knowledge of storm warnings, which at least showed the lack of prudence and caution that good seamanship required, and,

in the result of this case, cannot be said not to have entered into the causes that brought about the disaster. The barometer had been below normal for 24 hours. Storm signals at Old Point and the Capes were displayed, which, taking into account the size and character of the tow, and the power of the tug, should have admonished her navigators not to have gone to sea when they did, but to have exercised the prudence that many other masters did, by waiting with their tows until the weather conditions became more favorable.

Third. That the tug, at the time of the accident, was not in command of officers and a crew possessing the requisite knowledge, experience, and ability to handle in a safe manner a tug and tow of the size in question, in a storm at sea of the character encountered. Neither the master nor the mate of the tug were examined as witnesses, and the second mate, who was examined, seems to have been the special representative of the owner on board of the tug, and largely directed the ship's navigation. He held master's license for inland waters only, and he was technically acting in the capacity of second mate on the trip. Several of the crew were evidently unused to ocean voyages, and, when subjected to the hazards and hardships of the storm, became incapacitated, one from cramps, and several from seasickness.

Fourth. That those in charge of the navigation of the tug did not exercise the degree of prudence and caution that good seamanship required on the voyage after leaving the Capes, in that they navigated on a course which took them outside of the ordinary course for coastwise vessels, passing considerably to the outside of Winterquarter Light, and found themselves, at the time of the accident, some 32 miles or more to the eastward of the lightship, when they should, especially in view of the weather conditions, including a gale from the northwest, and the character of the tug and tow, have kept under the lee of the land, where they would have been subjected to much less hazard.

Fifth. That the navigators of the tug, at the time of the accident, failed utterly to exercise the degree of care required of them, in that, upon the indication of the violence of the storm becoming apparent, the tug should have headed to windward inshore, and, if possible, as could most probably have been done, taken the entire tow into smoother waters, and held it intact. That upon the steering gear parting, and finding themselves unable in any way to repair the break, either because of weather conditions, or failure to have an extra cable and other steering appliances at hand, they should have caused all three of the barges to be cut loose, and come to anchor, and attempted to stand by to protect them, which they could have done by keeping the Young's head to the wind, notwithstanding her broken steering gear; and certainly should not have attempted to take the Hudson in the trough of the sea, and tow her for two hours, until she foundered, after it was known she was disabled, and should have come to anchor.

[2] The contention that the occurrence was the result of inevitable accident cannot be maintained. To enable the tug to interpose this defense, it must itself have been free from fault. The Maryland (D.

C.) 182 Fed. 829, 831, 832, and cases cited. Nor does the evidence warrant the suggestion that the bronze tiller rope broke from latent defects; but rather, on the contrary, that it gave way from lack of inherent strength to withstand the strain made upon it.

The court's judgment is that the Young was clearly at fault in the particulars above enumerated; and that, while perhaps no one of them would of itself have brought about the disaster, combined together they clearly did so, without fault on the part of the tow, and, as a consequence, the Young should be held solely responsible for the losses sustained.

[3] This brings us to the question of the right of the owner of the tug to claim the benefit of limitation of liability prescribed by the act of Congress applicable in such cases; and the conclusion of the court is that, while there is considerable testimony tending to show that this exemption should be denied, still, upon the whole case, the relief sought should be granted. The negligence of the tug's navigators, and other acts and omissions of theirs, in connection with the voyage, and which entered into the happening of the accident, to which the owner was not privy, and of which he had no knowledge, and as to which knowledge should not be imputed to him (The Alola [D. C.] 228 Fed. 1006), entitled him to the exemption claimed.

[4] At the trial of this case, the claim of the owners of the tug John F. Lewis for salvage for bringing in barge No. 7 was by consent heard in this proceeding and submitted to the court. The petitioner claims $2,750. The value of the salved property was $55,000, and the value of the John F. Lewis, $70,000. The time taken in the service of towing her in consumed 16 to 17 hours. The barge at the time it was salved was in a perilous condition. The court believes, under the circumstances, that a fair award, having regard to the principles applicable to salvage, would be $1,450.

A decree in accordance with the foregoing views will be entered upon presentation.