### MARYLAND TRANSP. CO. v. DEMPSEY et al.

(Circuit Court of Appeals, Fourth Circuit. November 1, 1921.)

No. 1895.

1. **Towage** ⬅➡11(9)—**Tug held negligent in attempting voyage under weather conditions existing without even inquiry as to storm signals.**

A tug *held* negligent in attempting a voyage from Baltimore to Norfolk with three heavily laden seagoing barges early in the month of March, when the weather was cloudy and the barometer falling, and had been low for several days, without so much as an inquiry as to the existence of storm signals, which were up.

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Towage ⊙⟹11(1)—Tug bound to exercise reasonable and ordinary care, caution, and maritime skill.**

While a tug is not the insurer of its tow. and the duties of a common carrier are not imposed on it, it is charged with the exercise of reasonable and ordinary care, caution, and maritime skill in and about the service undertaken, and is liable for omissions in this respect.

**3. Towage ⊙⟹11(10)—Duty of tug to stand by or return at earliest moment when tow cast off, etc.**

Tugs owe a high degree of diligence to look after lives and property committed to their care, when from force of circumstances the tow is set adrift, cast off, or temporarily abandoned, and the obligation to stand by should be strictly observed, so long as it is reasonably safe and proper to do so, and it is the duty of the tug to return at the earliest moment and vigorously attempt to care for those in danger and distress.

**4. Towage ⊙⟹11(10)—Tug held negligent in not caring for tows which had been cast off during storm.**

Where a tug, during a gale on Friday afternoon, cast off its tows near the mouth of the Severn river, and did not return until late Saturday evening, and then left, though one of the tows was flying distress signals, and on the following day returned to Baltimore, under orders from its home office, for the alleged reason that it did not have sufficient coal to make the trip, though it had ample coal to bring in the barges, and another tug was not sent to aid the tows until Monday morning, after one of the tows had sunk, the tug *held* guilty of inexcusable negligence.

**5. Shipping ⊙⟹208—Tug's owner held to have participated in negligence, and not entitled to limitation of liability.**

Where the owner of a tug, through its vice president and executive officer, knew of a contract of towage from Baltimore to Norfolk, the capacity of the tug, and that the voyage was started under adverse weather conditions, and was advised by 'phone that the tows had been cast off, and its vice president subsequently directed the tug to return to Baltimore, the owner was not entitled to a limitation of liability, under Rev. St. § 4283 (Comp. St. § 8021), as it had full knowledge of, and participated in, the acts of negligence bringing about the loss.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Consolidated libels by John J. Dempsey, trading as Dempsey & Sons, and another, against the Maryland Transportation Company. From a decree in favor of the libelants (269 Fed. 665), defendant appeals. Affirmed.

John T. Tucker, of Baltimore, Md. (Keech, Deming, Kemp & Carman, of Baltimore, Md., on the brief), for appellant.

George W. P. Whip, of Baltimore, Md. (Harrington, Bigham & Englar, of New York City, and Lord & Whip, of Baltimore, Md., on the brief), for appellees.

Before WOODS and WADDILL, Circuit Judges, and BOYD, District Judge.

WADDILL, Circuit Judge. This is an appeal from a decree of the United States District Court for the District of Maryland, in admiralty, whereby the appellant was adjudged liable for the loss of the barge Curtin, belonging to Dempsey & Sons, and its cargo of fertilizer, belonging to the Miller Fertilizer Company, the appellees. Separate

libels were filed, which were consolidated by the District Court, as they involved the same subject-matter. The appellant, in its joint answer to the two cases, denied all liability for the loss, and interposed the claim of limitation of its liability to the extent of the value of the tug in any event.

The facts are, briefly, that on or about the 2d of March, 1920, the master of the barge Rita Dempsey, acting for himself and the captains of the barges Charles C. McNally and William W. Curtin, made a verbal agreement with the Maryland Transportation Company, the appellant, whereby the company agreed to tow three barges from Baltimore to Norfolk; the barge captains claiming that the contract was for the services of the tug Baltimore, and the appellant that it was for the Baltimore or the Seminole. About 8 o'clock on Friday morning, the 5th of March, the Seminole reported to take the barges in tow, and, after some question as to the right of the tug to serve, the objections were dropped; the masters being assured that the tug was of sufficient capacity to perform the service, and as powerful as other well known tugs. The barges Dempsey and McNally were not fully loaded, though the Curtin was about to its full capacity.

When the Seminole left Baltimore with the three barges in tow, the weather was cloudy, storm signals up, and the barometer falling, and it had been low for several days, which fact was known to the master and the owner of the Seminole, though neither of them made any inquiry respecting the weather signals before the tug left. The master of the Seminole explains that he thought the indications pointed to the probable existence of a heavy fog, which in point of fact did increase after the tug's departure. They started with the intention of going to North Point, and there be guided by the weather conditions. With the exception of the fog, the weather remained favorable, until between 2 and 3 o'clock in the evening, when about halfway between Baltimore Light and Sandy Point, the wind started to blow from the northwest, constantly increasing in velocity, and between 4 and 5 o'clock, it reached the proportions of a gale. The master of the Seminole claims to have headed to the wind, with a view of making harbor round Hackett's Point, in White Hall creek, but, failing in this, endeavored to enter the Severn river to anchor. This was found to be impracticable, and he cast off the barges, and with difficulty, as he claims, succeeded in making into Annapolis with the tug in safety. The three barges anchored, after considerable drifting, the Dempsey off the mouth of the Severn river, further into the bay than the others, and the McNally and the Curtin drifted somewhat to the westward of Kent Island, and some two miles from the Dempsey; the Curtin fetching up some quarter of a mile further outshore from the Island than the McNally.

On the tug's reaching Annapolis, the master 'phoned the Baltimore office, and informed Mr. Petty, vice president, of the conditions existing, and was directed by him to look out for the barges as soon as the weather moderated, which he promised to do. The storm continued through Friday night, and until late Saturday evening, at which time the tug went out to see about the tow. Upon interviewing the master

of the Dempsey, the tug's master was informed that that vessel was all right; and he was urged to go to the other two barges, which the master claims he attempted to do, but could not reach them on account of insufficient water, that he waited a while, and saw no one on the barges, and observed the Curtin afloat, headed to the wind, with distress signals flying. The tug then returned to Annapolis, and reported to Mr. Petty, appellant's representative, the then condition of affairs, and that he had not sufficient coal to take the tow to Norfolk. He was directed to return to Baltimore, and Mr. Petty informed him that he would send another tug to take the tow. From then on the Seminole had no further connection with the tow, and went to Baltimore on Sunday, while the weather was good, and on Monday between 11 and 12 o'clock, the tug Baltimore came down to take charge of the tow. Upon arriving where the barges were lying, it was ascertained that the Curtin had sunk on Sunday evening, about 4 o'clock.

The District Court held the appellant solely at fault for the loss, denied the right to limitation of liability, and entered a joint judgment against the appellant for the agreed value of the cargo, of $15,101.82, and the barge, of $11,200. From that decree, this appeal was taken.

[1] Two questions are presented for the consideration of the court: First, the liability of the tug under the facts as presented; and, second, whether the right of limitation of liability existed. These will be considered in the order named, considering the first question from two viewpoints, viz. the tug's liability because of the circumstances connected with furnishing the tug, and of its departure in the service, in the threatening weather conditions, and its conduct in failing properly to care and look out for the safety of its tow after the danger arose. The District Court's conclusion on the first proposition was that the power of the tug for the service contemplated, was doubtful, that the competency of the tug's master was questionable, and that he attempted a voyage, having regard to existing weather conditions, which should not have been undertaken. With these conclusions, after careful review of the testimony, this court fully concurs. The season of the year was itself an admonition of danger, and to have attempted a voyage from Baltimore to Norfolk, with three heavily laden seagoing barges of the character here during the prevalence of the weather conditions described, and well known so far as the falling barometer was concerned, with a tug of the size and power of the Seminole, and without so much as an inquiry as to the existence of storm signals, was of itself negligence.

[2] The duty owed by a tug to its tow is well settled, and while a tug is not the insurer of its tow, nor has the duties of a common carrier imposed upon it, it is nevertheless charged with the exercise of reasonable and ordinary care, caution, and maritime skill in and about the service undertaken, and for omissions in this respect, liability follows. The Margaret, 94 U. S. 494–497, 24 L. Ed. 146; The Britannia (D. C.) 148 Fed. 495–497. Authorities requiring navigators to observe and respect barometrical indications and usual weather warnings, before departure, and on voyages, are abundant. Southern Towing Co. v. Egan, 184 Fed. 275–278, 106 C. C. A. 417 (C. C. A. 4th

Cir.); The Salutation (D. C.) 239 Fed. 421–423; The Richard F. Young (D. C.) 245 Fed. 499, 501; Nicholson v. Erie R. R., 255 Fed. 54, 55, 166 C. C. A. 382 (C. C. A. 2d Cir.); Texas & Gulf S. S. Co. v. Parker, 263 Fed. 864–868 (C. C. A. 5th Cir.); Doherty v. Penna. R. R. Co., 269 Fed. 259, 263 (C. C. A. 2d Cir.). Not only were the weather conditions and the falling barometer known before departure on the voyage, but en route the tug's mate called attention to the fact that the latter was rapidly falling, and a second time suggested the probability of a storm from the northwest, following the prevailing fog.

[3] Coming now to the tug's failure to provide for the safety of its tow after danger became imminent, aside from the indifference shown, in the celerity with which the tug cut loose from its tow, and apparently fled in alarm to a place of safety, the lack of consideration for the lives of the crews and property on the barges cannot be overlooked. Tugs owe a high degree of diligence to look after lives and property committed to their care, when, from force of circumstances, the tow is set adrift, or has to be cast off, or even temporarily abandoned. The obligation to stand by should be strictly observed, as long as it is reasonably safe and proper to do so. The duty of the tug to return at the earliest moment, and vigorously attempt to care for those in danger and distress, who cannot get away because of lack of motive power, is manifest, as well from the relation they occupy to the tug as from the plainest sense of humanity. Failure to do so constitutes negligence, and for losses resulting therefrom there is liability on the tug, especially where it appears that the loss and damage might have been avoided by the proper discharge of those plain obligations. In re Moran (D. C.) 120 Fed. 556, 564, the court said:

"To excuse a tug for leaving and remaining away from her tow, there should be proof that the tow was sinking, or past saving, or that the tug was so injured or in such danger that it could not stay or return, or similar condition."

In Appeal of Cahill, 124 Fed. 63, 64, 59 C. C. A. 519, 520 (C. C. A. 2d Cir.), the court said:

"Even if the circumstances had been sufficient to justify the master of the tug in cutting loose from the dredge in order to take off the men, they did not justify him in deserting her and her scows and allowing them to be beached without any effort to save them. We are satisfied there was a reasonable chance that they could have been saved if the tug had resumed charge of them. Their owner was entitled to the benefit of the chance, and as he has been deprived of it by the conduct of the tug, in disregard of her duty to use all reasonable efforts for the preservation of her tow, the tug must respond for the consequences, in the absence of clear proof that her efforts would have been ineffectual."

In Alaska Commercial Co. v. Williams (C. C. A. 9th Cir.) 128 Fed. 362, at page 368, 63 C. C. A. 92, at page 98, the court, considering the length of time the duty to look after the tow lasted, said:

"It certainly existed during that day and so long thereafter as the schooner continued to drift toward the shore or to proceed on her course toward Yakutat, and so long as the Bertha could have returned and rescued her."

In Atkinson v. Scully (D. C.) 246 Fed. 463, 466, the court said:

"It must be remembered that the courts have held tugs to a high degree of diligence in endeavoring to save a tow which has gone adrift. Usually the tow is helpless, and to abandon it is to commit it to almost certain loss or injury, where a gale is on and the sea is rough."

See, also, The Richard F. Young, supra (D. C.) 245 Fed. 499, 502.

[4] In the present case, assuming it was proper for the tug to have cast off the tow on Friday night and gone into Annapolis, it should have been more prompt and diligent in returning to the assistance of the barges on Saturday. It should have done so at the earliest moment is was safe to make the attempt, and not have waited until Saturday at 4 p. m., and then go only to one of the barges. The storm had abated largely by Saturday afternoon; but, assuming it was not practicable to have moved the barges at that time, the lives of the crews should have been thought of, and, knowing that two of the barges were in danger, one actually flying distress signals, it was inexcusable negligence not to have returned promptly Sunday morning, when good weather prevailed, instead of proceeding to Baltimore under orders from the home office. The alleged excuse of lack of coal to complete the voyage to Norfolk, and the promise that another tug would be sent to take charge of the tow, which, however, did not arrive until the following Monday morning, between 11 and 12 o'clock, will not suffice to exonerate the tug. The barges could readily have been brought in on Sunday morning, so far as weather conditions were concerned; and the suggested shortage of coal to make the trip to Norfolk cannot be accepted as an excuse. There is no pretense that there was not ample coal to bring in the barges. The trip to Baltimore, instead of to the barges, and the action of the Baltimore office in waiting from Saturday night until Monday morning to send a tug to the beleaguered vessels' aid, readily brought about the loss sustained; the Curtin having remained afloat until 4 o'clock Sunday evening.

[5] Second. There remains only for consideration the right of the appellant to limitation of its liability to the value of the tug. The lower court denied this limitation, because of the privity and knowledge of the owner of and concerning the matters which brought about the disaster. In this view we fully concur. The owner, through its vice president and executive officer, whose privity is that of the owner, knew certainly of the contract of towage, the capacity of the tug for the service to be rendered, and that the voyage was to be started in the prevailing weather conditions; and the failure to protect and care for the tow, after the vessels were cast loose, was more the act of the chief officer than that of the tug's master. Hence the effort to secure limitation of liability will not be granted. The decision of this court in the very recent case of Peoples Navigation Co. v. Toxey, 269 Fed. 793, aptly states this court's views on the subject of limitation of liability. That the act of Congress (section 4283, R. S. [Comp. St. § 8021]), should be liberally construed in favor of vessel owners, and in furtherance of promoting commerce, is conceded; but it can have no application to a case like this, where the tug's owner had full knowl-

edge of and participated in the acts of negligence bringing about the loss.

The decision of the lower court will be affirmed, with costs.

Affirmed.