## THE A. L. WALKER.

### THE TOMPKINSVILLE.

## THAMES TOWBOAT CO. v. EASTERN TRANSP. CO.

#### No. 1682.

District Court, D. Maryland.

Dec. 18, 1930.

Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, Md., and Park, Mattison & Lynch, of New York City, for libelants.

John L. V. Murphy, of Baltimore, Md., and Foley & Martin, of New York City, for respondents.

SOPER, District Judge.

The libel of the Thames Towboat Company, as owner of the barge Theodore Palm-

er, and as bailee of a cargo laden thereon, was brought against the tug A. L. Walker and the barge Tompkinsville, and against the Eastern Transportation Company, the owner of said vessels, to recover damages arising from the sinking of the Theodore Palmer and cargo on October 4, 1928, off Atlantic City, N. J., en route from Newport News, Va., to New London, Conn. The tug left Hampton Roads at 1 p. m. on October 2, 1927, with three barges in tow, to wit, the Tompkinsville, the Theodore Palmer, and the E. R. Haggett, in the order named. The Tompkinsville and the Palmer were loaded with coal, and the Haggett with brick. The Haggett also belonged to the Eastern Transportation Company. The tug's hawser, 225 fathoms in length, was out between the tug and the Tompkinsville, the leading barge, while the hawsers between barge and barge were 200 fathoms in length. The Palmer was attached by her own hawser to the Tompkinsville.

It is claimed that the Palmer and cargo were sunk and lost by reason of the negligence of the tug Walker and the barge Tompkinsville in the following particulars:

(1) That the tug should have sought harbor in the Delaware Breakwater as it proceeded up the coast either from Fenwick Island Lightship or at some point between that Lightship and Five Fathom Bank Lightship to the north, and certainly before passing Northeast End Lightship.

(2) That the tug's hawser was negligently made fast on the Tompkinsville and consequently slipped off the bit during the storm which took place in the early morning of October 4, whereby the tow was cast adrift and the Palmer, as well as the Haggett, were so pounded in the trough of the sea that they were lost.

(3) That after the hawser slipped off the bit of the Tompkinsville, the crew of that vessel cut the Palmer's hawser without warning, and she was left at the mercy of the storm.

(4) That the tug, after losing the tow, failed to stand by and render timely assistance to the Palmer.

■■ The most important charge of negligence is the first. To establish it the burden of proof is upon the libelant. Southgate v. Eastern Transportation Co. (The Director) (C. C. A.) 21 F.(2d) 47. And the libelant must show not merely an error of judgment on the part of the navigator, but the lack of that degree of prudence that one having ordinary maritime skill and experience would have exercised under the circumstances. Southern Towing Co. v. Egan (C. C. A.) 184 F. 275, 278; The E. V. McCaulley (D. C.) 189 F. 827. But it is obvious that in the case of a tug burdened with three barges on a coastwise voyage, one having ordinary maritime skill and experience would give heed to all available sources of information as to weather conditions, including not only those discernible by the navigators of the tug, but also the radio, the bulletins, and signals of the United States Weather Bureau and the barometric readings. In Maryland Transportation Co. v. Dempsey, 279 F. 94, 97, Judge Waddill, speaking for the Circuit Court of Appeals of this circuit, said:

"The duty owed by a tug to its tow is well settled, and while a tug is not the insurer of its tow, nor has the duties of a common carrier imposed upon it, it is nevertheless charged with the exercise of reasonable and ordinary care, caution, and maritime skill in and about the service undertaken, and for omissions in this respect, liability follows. The Margaret, 94 U. S. 494–497, 24 L. Ed. 146; The Britannia (D. C.) 148 F. 495–497. Authorities requiring navigators to observe and respect barometrical indications and usual weather warnings, before departure, and on voyages, are abundant. Southern Towing Co. v. Egan, 184 F. 275–278, 106 C. C. A. 417 (C. C. A. 4th Cir.); The Salutation (D. C.) 239 F. 421–423; The Richard F. Young (D. C.) 245 F. 499, 501; Nicholson v. Erie R. R., 255 F. 54, 55, 166 C. C. A. 382 (C. C. A. 2d Cir.); Texas & Gulf S. S. Co. v. Parker, 263 F. 864–868 (C. C. A. 5th Cir.); Doherty v. Penna. R. R. Co., 269 F. 959, 963 (C. C. A. 2d Cir.)."

See also Bronx Barge Corp. v. Connelly Trans. Corp. (C. C. A.) 35 F.(2d) 294.

It is not claimed that the weather conditions were such that a prudent navigator would not have sailed from Norfolk on October 1 with the tow, but that on the second day of the voyage up the coast, weather conditions became such that a careful seaman would have realized that a severe or violent storm was approaching and would have taken refuge, while there was still time, to avoid the catastrophe. The logs of the tug and of the several lightships along the coast disclose the following situation, in which the barometer readings of the tug and the reports of the weather conditions by the lightships are combined. This statement seems to accord with the libelant's view of the facts, for it was embraced substantially in the hypotheti-

cal questions on the necessity of seeking harbor before the storm propounded by counsel for libelant to its expert witnesses.

The tow successively passed the following positions at the times and under the conditions indicated by the barometer and the weather, hereinafter set out. Having left Newport News on October 2 at 1 p. m., the tow passed

Cape Henry at 5:10 p. m., barometer 30.28;

Hog Island at 11:10 p. m., barometer 30.26.

October 3:

Paramour Gas Buoy at 2:05 a. m., barometer 30.24;

Winter Quarter Light Vessel at 8:10 a. m., barometer 30.23;

Fenwick Island Light Vessel at 2:08 p. m., barometer 30.10;

Five Fathom Bank Light Vessel at 6:40 p. m., barometer 29.97.

It thus appears that during the six hours consumed in running between Winter Quarter and Fenwick Island, the barometer fell .13, and in the subsequent four and a half hours, an additional .13, while the tow was en route between Fenwick Island and Five Fathom Bank.

The weather conditions on October 3 are shown by the following record: At 8 a. m. when the tow passed Winter Quarter Lightship, the weather was cloudy and the wind was from the southeast with a velocity of from 8 to 13 miles an hour. The approximate conditions when the vessel passed Fenwick Island at 2:08 p. m. are indicated by the records which show that at that point at noon the weather was cloudy and the wind was from the south with a velocity of from 13 to 18 miles an hour, while at 4 p. m., the weather was rainy and the wind from the south southeast with a velocity of from 18 to 23 miles an hour. The conditions when the vessel passed Five Fathom Bank at 6:40 p. m. are indicated by the records which show that at that point at 4 p. m. the weather was variable and the wind from the south southeast with a velocity of from 18 to 23 miles an hour, while at 8 p. m. the weather was cloudy, the sea moderate, and the wind from the south southeast with a velocity of from 23 to 28 miles an hour. The conditions at 8:45 p. m., when the vessel passed Northeast End Lightship, are indicated approximately by the record, which shows that at 8 p. m. the wind was south southeast with a velocity of from 23 to 28 miles an hour at that point.

Fenwick Island Lightship is situate some twenty-five miles southerly from the entrance to the Delaware Breakwater, while Five Fathom Bank Lightship is approximately opposite that entrance; so that at any time between 2:08 p. m., when the vessel was at the former point, and 6:40 p. m. on October 3, when she was at the latter point, it would have been possible for her to have sought harbor in the Breakwater. Northeast End Lightship is some thirty miles beyond the Breakwater. After the flotilla had passed Five Fathom Bank and Northeast End Lightships, and the severe storm had broken out, it would not have been possible, by reason of the violence of the wind, to have turned about and reached the harbor. As a matter of fact, the flotilla continued safely on its course in the usual manner until 10:30 p. m., an hour and three-quarters after it had passed Northeast End. Then the tug slowed down to half speed to diminish the great strain on the tow occasioned by the high wind that had come up in the meantime. The log of the Northeast End Lightship shows that by midnight the wind had veered to the south and had reached a velocity of from 48 to 56 miles an hour, and that it was squally and very rough. At 2 a. m. the wind was southwest by south, with a velocity of 56 to 65 miles an hour, and the weather was rainy. At 4 a. m. the wind was from the southwest, with a velocity of from 28 to 34 miles an hour, and the weather was cloudy; at 8 a. m. the weather was cloudy and the wind was from the west with a velocity of from 18 to 23 miles an hour. It seems clear that the wind did not reach extreme violence until after the vessel had passed Northeast End Lightship, and that the storm was at its height from midnight until 2 a. m. of October 4. According to the Weather Bureau at Atlantic City, the wind reached a maximum velocity of 72 miles an hour on October 4.

Storm warnings were issued by the United States Weather Bureau on October 3, but they came too late, even though it be assumed that the navigator of the tug had or should have had notice thereof. The records of the bureau show that an order was issued at 8:58 p. m. on October 3 that southwest storm warnings should be hoisted at 9:30 p. m. from Delaware Breakwater to Eastport. The bureau was of the opinion that a disturbance over Virginia was moving northward with increasing intensity, and would cause strong south winds and gales that night shifting to southwest and west on the following day and diminishing. A storm warning

was also broadcast by radio from Arlington, Va., at 10:05 p. m. The Walker did not receive it; but at this time the tow was well past Northeast End Light, and with the increasing wind, would in any event have been unable to have reached the Breakwater.

The question of fact for decision is whether the strong gale which actually arose should have been anticipated by the navigator of the tug when there was still time to seek safe harbor in the Breakwater. A layman, unassisted by expert advice, would not be able to conclude from the evidence that the conditions were such when the flotilla reached Five Fathom Bank, or indeed while it was en route between that point and Northeast End, that a prudent seaman would have taken refuge. The wind was increasing somewhat in velocity and the barometer was falling; but the evidence does not show that the wind was dangerously high and the significance of the decline in the barometer is not clear to the uninitiated. On the one hand, a witness for the libelant said that the fall of .13 in six hours between Winter Quarter and Fenwick Light was not a very rapid fall, although an indication of bad weather, while on the other hand a witness for the respondent said that the fall of .13 in four and a half hours between Fenwick and Five Fathom Bank was a sudden fall, but did not signify unfavorable conditions. To clarify this uncertainty, the libelant offered the testimony of two experts, who testified, in substance, that a tug with three barges in a heavy sea with the wind in the south southeast and a falling barometer, as indicated, should have made for the Breakwater because an experienced man would expect to get a gale of wind from such conditions. One of these witnesses was not shaken in his testimony; but it was proved to the satisfaction of the court that the other expert had been interviewed by counsel for the respondent long before his employment by the libelant and had said, after being informed as to the contents of the log of the vessel, and the reports from the Weather Bureau at Washington, that there was no reason why the tug, when passing the Breakwater, should have anticipated the storm which was subsequently encountered. Hence the contention of the libelant depends to a great extent upon the opinion of a single expert who, though an experienced mariner, had no personal knowledge of the conditions but was obliged to base his conclusions upon a hypothetical statement of the facts.

The testimony on behalf of the respondent, on the other hand, on the point in question consists in part of the evidence of three tug boat captains who were actually in command of tows proceeding easterly along the coast on the night in question. One of these, the captain of the tug Neptune, escaped the storm by reason of the fact that he left Newport News some four hours before the Walker and its tow. His testimony therefore approximates that of an expert witness, who did not have first hand knowledge of the precise conditions. His opinion was that the navigator of the Walker had no reason to expect that he would encounter adverse towing conditions. More important is the testimony of the captain of the tug Keshena and the captain of the tug Jupiter, each of which had three barges in tow. The first vessel left Norfolk about the same time as the Walker, and passed Northeast End about thirty-seven minutes later. The two tows were in sight of each other on the way up the coast, and met precisely the same conditions. The Keshena encountered no difficulties and was obliged only to slow down at 11 p. m. on the night of October 3. It received no damage but safely reached port.

The Jupiter was a much larger tug than the Walker, but it had no greater relative towing power because of the larger size of its tow. The Jupiter left Norfolk two hours before the Walker, but arrived at Northeast End at 10 p. m., more than an hour later. The Jupiter's captain likewise saw no necessity of seeking harbor in the Delaware Breakwater, although he did not pass Fenwick Lightship until 2:55 p. m. or Five Fathom Lightship until 7:35 p. m. Shortly after passing Northeast End, the Jupiter hove to and turned its head to the storm and remained in this position until 4 a. m., when, the wind having changed, it sought to turn about and continue on its course, but the master of the leading barge became alarmed and cut the tow adrift. There was no other accident or casualty in the case of this tow.

The masters of the Jupiter and the Keshena were experienced seamen, and the problem which they had to meet was the same as that which confronted the Walker. The fact that each of them took the same risk as the master of the Walker, without mishap, is of course not conclusive of the issue, for there is the possibility that they may have escaped injury from good fortune rather than due care; but there is no reason to doubt their entire good faith and their conclusions, when burdened with the same responsibility for life and property, are most persuasive. It

is not often that a tribunal in a case of negligence finds the "ordinarily prudent man" in the flesh and close at hand. It is the conclusion of the court that the libelant has failed to show that the navigator of the Walker was negligent when he failed to take refuge in the Delaware Breakwater before the storm broke.

The remaining charges of neglect relate to the circumstances which arose after the storm was at its height and the tow went adrift. It is said that the Palmer was lost because the tug's hawser was negligently fastened to the Tompkinsville and because the crew of the Tompkinsville, finding themselves adrift, negligently cut the Palmer loose without warning. It is by no means clear that the Palmer sank because the tow went adrift from the tug or because the crew of the Tompkinsville cut the Palmer's hawser without warning. The most that can be said from the libelant's standpoint is that these circumstances brought about an emergency in which the captain of the Palmer failed to take ordinary precautions for the safety of his vessel and left her to the mercy of the elements whereby she was lost. He testified that all went well with the tow until about 1 a. m. on October 4, although the storm reached its height about 11 p. m. and continued thus until 3 a. m. in the morning. About 1:30 p. m. the lights of the tug disappeared from his view, followed within a few minutes by the disappearance of the lights of the Tompkinsville. It was then noticed that the Palmer's hawser, by which it was attached to the Tompkinsville, had become slack and the captain of the Palmer became aware that the tow was adrift. About the same time, a tee connection, connecting the boiler with the pumps and the machinery of the Palmer broke down, and thereafter it was not possible to use the pumps or to operate the machinery, or even to use the steam whistle. The decks of the drifting vessel were awash, and it took much water as it rolled in the trough of the sea. The captain realized that his boat was in serious danger but that if she were anchored, and her head brought into the wind, the strain upon the vessel and the danger of loss would be minimized. He said that he received no signal to anchor from the tug after the barges went adrift, but that the storm was very noisy and the signal might have been given without his hearing it. The testimony of the crew of the tug is that the signal to anchor was given, and it seems altogether reasonable to accept this statement as true, and to account for the failure of those on board the Palmer to hear it by reason of the violence of the storm. The Tompkinsville did anchor and was saved without damage of any sort.

The captain of the Palmer said that he did not anchor because he thought that his barge was still connected with the Tompkinsville and that he feared that the vessels would collide in the heavy seas if he anchored. As a matter of fact, the Tompkinsville had cut the hawser when it anchored but gave no signal to the Palmer. The testimony of the Palmer's captain on this point is not persuasive. If he was in doubt, he could have cast off the hawser and anchored without fear of collision. Moreover, when daybreak came on, and he saw that he was free from the Tompkinsville, he still failed to anchor. He stated that if his anchor were out when the tug returned to pick him up, he would be unable for lack of steam to recover it. His reluctance to lose his anchor was undoubtedly the controlling reason for his inaction, but it was clearly an insufficient reason under the necessities of the occasion. See Southgate v. Eastern Transportation Co. (C. C. A.) 21 F. (2d) 47, 49. The danger of the Palmer was all the greater because it was impossible to pump the ship when the steam line broke. There can be no question that the immediate cause of the sinking of the vessel was due to this accident and the failure to anchor. The tug returned between 7 and 8 o'clock in the morning, but there was then so much water in the vessel that it was necessary to take the crew off and though the tug stood by the entire day, there was no way to rid the vessel of water and she finally sank at 7:30 p. m.

There remains the question whether it may be said that the hawser of the tug slipped off the Tompkinsville through the negligence of either vessel, and that this negligence contributed with that of the Palmer's captain to bring about the loss of his craft. The hawser was attached to the leading barge and held in place by an eye in its end which was placed over two towing bits 10 to 12 inches apart, one behind the other in the center of the barge at the bow end. Then the hawser was passed through a metal chock on the rail of the ship which consisted of a heavy piece of iron in the shape of a broken ellipse. The base of the chock was bolted to the rail of the ship and the curving horns thereof prevented the hawser from sliding from side to side across the bow of the barge. There is some testimony that hawsers of this kind are sometimes lashed to prevent their slipping from the bits of the

barge, but by far the greater weight of the testimony is to the effect that the manner in which the hawser was attached in this instance was not only the customary method but one which was entirely safe. The conclusion of the court is that there was no negligence in this respect. The testimony shows that the slipping of a hawser so attached was well nigh unheard of and an accident which it is not reasonable to anticipate. The unexpected happened in this case. The hawser did come off, and the chock itself, although recently installed on the boat with proper care, was torn away from the barge and lost. It is incumbent upon one who sets up an unavoidable accident as a defense in a case of this sort to show that he was without fault. The Newa (C. C. A.) 267 F. 115; Cranberry Creek Coal Co. v. Red Star Towing & Transp. Co. (C. C. A.) 33 F.(2d) 272. But this burden has been met in the case at bar, since the testimony of the crews of both vessels affirmatively shows that neither was in any way responsible for the slipping of the hawser.

That which has been said above also answers the charge of negligence that the Tompkinsville gave no warning to the Palmer that the latter's hawser was cut. It is true that no signal was given, but it seems quite likely that had one been given, it would not have been heard by the crew of the Palmer as was the case of the signal given by the tug. In any event, the lack of signal by the Tompkinsville did not contribute to the loss of the Palmer. The causes of the sinking of the vessel, as has been shown above, were the breaking of the steam connections which put the pumps out of commission and the failure of the captain to anchor the barge when he knew that she was adrift. He needed no signal to be advised that the vessel should be anchored and should not be left at the mercy of the seas.

Finally there is the charge that the tug failed in her duty to stand by the barge in distress. The rule of law on this question was thus set out in the case of Maryland Transp. Co. v. Dempsey (C. C. A.) 279 F. 94, 98:

"Tugs owe a high degree of diligence to look after lives and property committed to their care, when, from force of circumstances, the tow is set adrift, or has to be cast off, or even temporarily abandoned. The obligation to stand by should be strictly observed, as long as it is reasonably safe and proper to do so. The duty of the tug to return at the earliest moment, and vigorously attempt to care for those in danger and distress, who cannot get away because of lack of motive power, is manifest, as well from the relation they occupy to the tug as from the plainest sense of humanity. Failure to do so constitutes negligence, and for losses resulting therefrom there is liability on the tug, especially where it appears that the loss and damage might have been avoided by the proper discharge of those plain obligations."

This case was reaffirmed by the same court in Southgate v. Eastern Transp. Co., supra, where it is said [page 49 of 21 F. (2d)] that the court had no desire to depart from anything stated in its prior ruling, especially as to the duty and care imposed upon a tug to its tow cast off in a storm. It was held, however, that the facts in the case under consideration were so unlike those in the Dempsey Case that there was no room for the application of the rule. Such also is the situation in the case at bar. The tow went adrift at 1:30 a. m. in the midst of a violent gale. It was impossible under the circumstances for the tug to locate the precise whereabouts of the tow. The tug stood by until daybreak when it located the position of the Tompkinsville at anchor and later found the Palmer and the Haggett adrift at a place seven or eight miles distant. There was nothing more that the tug could do in the meantime. Had the Palmer been sighted during the night, no relief to the vessel would have been possible. Indeed, relief was impossible after the storm had abated and daylight came, for it was then impossible to pump the ship or to prevent its sinking. All that could be done was to take off the crew and stand by.

It is the conclusion of the court that the libelant has failed to make out the specifications of negligence on the part of the respondent or its vessels, and that therefore the libel must be dismissed.